29
MacCONAGHY & BARNIER, PLC
JOHN H. MacCONAGHY, SBN 83684
JEAN BARNIER, SBN 231683
645 First St. West, Suite D
Sonoma, California 95476
Telephone:  (707) 935-3205
Email:      macclaw@macbarlaw.com


Attorneys for Chapter 11 Trustee
RANDY SUGARMAN

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

| | |
|---|---|
| In re | Case No. 18-11651 |
| GREGORY JOHN Te VELDE | (Chapter 11) |
| | **DCN: MB-44** |
| | **DISCLOSURE STATEMENT FOR CHAPTER 11 TRUSTEE'S PLAN OF REORGANIZATION [DATED MAY 3,  2019]** |
| Debtor. | |

THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE UNITED STATES BANKRUPTCY COURT FOR THE EASTERN DISTRICT OF CALIFORNIA AS CONTAINING ADEQUATE INFORMATION AS REQUIRED BY THE BANKRUPTCY CODE FOR SOLICITATION OF ACCEPTANCES OF THE CHAPTER 11 PLAN OF REORGANIZATION DATED MAY 3, 2019, AND FILED BY THE CHAPTER 11 TRUSTEE  IN THIS PROCEEDING.  HOWEVER,  APPROVAL OF THE DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN ENDORSEMENT OF THE PLAN BY THE COURT.  THE COURT HAS MADE NO INDEPENDENT INVESTIGATION OR DETERMINATION OF ANY FACTUAL STATEMENTS OR DOLLAR VALUES SET FORTH IN THE PLAN OR THE DISCLOSURE STATEMENT.

## EXECUTIVE SUMMARY

This Disclosure Statement has been prepared by Randy Sugarman, the Court appointed Chapter 11 Trustee[1] in this bankruptcy case (the "Chapter 11 Trustee ") to give Creditors sufficient information to intelligently vote on the accompanying Chapter 11 Trustee's Plan of Reorganization.   Creditors should consult their own advisors before making a decision on how to vote.

### WHO IS PROPOSING THIS PLAN ?

This Plan is proposed by Randy Sugarman, the Chapter 11 Trustee of the Estate of Gregory J. Te Velde.  The Chapter 11 Trustee is a certified public accountant and court-supervised professional fiduciary nominated by the Office of the U.S. Trustee, a component of the U.S. Department of Justice, to take over the management of this case.  Mr. Sugarman was appointed on the Order of the Bankruptcy Court made pursuant to Bankruptcy Code Section 1104, and after a noticed hearing on the Motion to Appoint Chapter 11 Trustee filed by the Office of the United States Trustee.  One of the jobs of a Chapter 11 Trustee is to formulate a Chapter 11 Plan, if appropriate.

Most Chapter 11 Plans are proposed by the debtor; i.e., the bankrupt entity.  In this case, however, the Chapter 11 Trustee has proposed his own Plan because he believes it will result in an efficient and timely return for Creditors.

### WHY UNSECURED CREDITORS SHOULD VOTE FOR THIS PLAN

In the Chapter 11 Trustee 's opinion, all unsecured Creditors should vote for this Plan, because it will result in the orderly liquidation of the Debtor's assets and the continuation of the Debtor's remaining dairies  as a going concern in the interim, the oversight of the Debtor's assets by a professional fiduciary, and the timely payment of the best feasible dividend on creditor claims.  In the Chapter 11 Trustee's opinion, the only viable alternative to the Plan is dismissal of

---

[1]  Capitalized terms used in this Disclosure Statement are defined in the accompanying Plan of Reorganization.

the case or surrendering all assets to the secured creditors, in which case unsecured Creditors will likely get nothing.

### HOW TO VOTE ON THE PLAN

An acceptance or rejection of the Plan may be voted by completing the ballot which accompanies the Plan and mailing, faxing, or emailing it to MacConaghy & Barnier, PLC, attorneys for the Chapter 11 Trustee, 645 First Street West, Sonoma, California 95476, facsimile: (707) 935-7501, macclaw@macbarlaw.com.

### DISCLAIMER OF FINANCIAL INFORMATION PROVIDED BY THE DEBTOR

In order to comply with requirements of Bankruptcy Code Section 1125 concerning the adequacy of Disclosure Statements, the Chapter 11 Trustee as a Plan proponent must provide the best available financial information concerning the Debtor. Some of the financial information contained in this Disclosure Statement comes from unaudited data under the Debtor's control and covers time periods prior to the Chapter 11 Trustee's appointment. The Chapter 11 Trustee cannot independently verify the accuracy of this information.

### FINANCIAL INFORMATION CONCERNING THE DEBTOR

The Debtor Gregory J. te Velde is an individual who grew up in the dairy business and as of the filing of his Chapter 11 case owned three large dairies – two in Tulare County, California (G.J. te Velde Dairy and Pacific Rim Dairy) and one in Boardman, Oregon (Lost Valley Farm). Mr. te Velde filed Chapter 11 bankruptcy on April 26, 2018 due to a combination of falling milk prices, over-leverage, environmental problems at the Lost Valley Farm, and mismanagement of his dairy operations. Mr. te Velde remained in control of his affairs as a Chapter 11 "debtor-in-possession" up through September 21, 2018. At that time, Randy Sugarman was appointed as Chapter 11 Trustee pursuant to Bankruptcy Code Section 1104 due to various allegations of post-petition mismanagement by te Velde. Since then, Mr. Sugarman has assumed complete control over all assets and operations of te Velde by operation of law.

A summary of the income and disbursements in this Chapter 11 case is set forth in the

1   summary pages of the most recent Monthly Operating Report for the Estate, which is attached to

2   this Disclosure Statement and labeled Exhibit 1.  The assets and liabilities of the Estate are

3   discussed in narrative form below.

4                                    **THE LOST VALLEY FARM**

5           The largest dairy owned by the Debtor as of the Petition Date, since sold by the Trustee,

6   is the 7300 +/- acreLost Valley Farm.  The Debtor purchased the Lost Valley Farm in November,

7   2015 from Boardman Tree Farm, LLC for $65 Million, paid with a $10 Million cash down

8   payment and a $55 Million purchase money deed of trust.  There was no dairy on the site when

9   the Debtor purchased it; instead about half of it was used as a commercial tree farm.  He  then

10  spent millions of dollars attempting to develop the Lost Valley Farm into state of the art dairy,

11  and developing the tree farm into irrigated crop land.  Most of that money was borrowed from the

12  borrowing base of his two California dairies or obtained from the California operations by

13  stretching out the  trade creditors to those facilities.

14          The Lost Valley Farm is located in an environmentally sensitive area in the Columbia

15  River Basin.  To operate it, the Debtor was required to obtain a "CAFO" permit [Confined

16  Animal Feeding Operation] from the Oregon Department of Agriculture ["ODA"].  Essentially,

17  the CAFO required the Lost Valley Farm to be a self-contained system in which the effluent from

18  the large dairy herd was all captured and contained on impermeable surfaces, then processed to

19  fertilize the thousands of acres of available land to grow dairy feed to nourish the animals.

20  Unfortunately, the system was poorly designed and constructed when the Debtor commenced

21  operations.  Thus, the effluent did not properly drain from the dairy stalls, effluent leaked from

22  various parts of the waste management system, the irrigation pivots used to "land apply" the

23  liquid waste were inadequate and incorrectly placed, and, most importantly, there was

24  insufficient cleared land on which to place the required amount of effluent; i.e., several thousand

25  acres of land still contained trees and tree stumps which needed to be cleared before the system

26  could operate a full capacity.

1    All of this resulted in very aggressive litigation and administrative enforcement actions

2   against the Lost Valley Farm by the ODA and the Oregon Attorney General's office resulting in

3   civil contempt proceedings, fines, and a revocation of the CAFO.  Due in part to the highly

4   negative publicity generated by the Debtor's environmental law violations, the principal

5   customer of the Lost Valley Farm – the Tilamook co op dairy – declared a default in its long-

6   term supply contract with the Debtor.

7    After concluding that it would take an additional $35 - $40 Million to develop the Lost

8   Valley Farm into a viable operation, and with no source of funds to do so, the Trustee concluded

9   that it was in the best interests of the Estate to liquidate the Lost Valley Farm.  With Bankruptcy

10   Court authorization, the Trustee auctioned off the entire cattle herd in phases, concluding this by

11   the end of February, 2019.  The proceeds of this livestock sale were used to pay off the holders of

12   unpaid Oregon Statutory Agricultural Service Liens in the approximate amount of $2,000,000,

13   and the balance of approximately $8,000,000 was used to pay down the blanket UCC-1 secured

14   loan of Rabobank, N.A.[2]  Also with Bankruptcy Court authorization, the Trustee sold all of the

15   land, farming equipment, and other assets to Canyon Farm, LLC for the sum of $66,734,000.00.

16   That sale closed on March 1, 2019.   The net sales proceeds were used to pay off all outstanding

17   real property taxes and the holders of all purchase money equipment liens on the Lost Valley

18   Farm equipment in the aggregate amount of approximately $2,200,000.  Of the balance,

19   approximately $53,000,000 was paid to Boardman Tree Farm, LLC in partial satisfaction of its

20   first deed of trust,  approximately $7,250,000 was paid to Rabobank, N.A., on account of its on

21   account of its blanket UCC-1 secured loan, and the balance was held back to address residual

22   potential liabilities.

23

24    [2] Rabobank, N.A. has two secured loans, which are discussed in greater detail below.  The
first is a real estate loan in the approximate amount of $24,000,000 as of the Petition Date,
25   secured by a first deed of trust on the G.J. te Velde Dairy.  The second is a personal
property/operating loan in the approximate amount of $44,000,000 as of the Petition Date,
26   secured by all livestock, feed, growing crops, farming equipment and other personalty on all
three dairies.

1    The sale of the Lost Valley Farm did not eliminate the Estate's potential environmental

2    liabilities under the CAFO, which are liabilities personal to the Debtor (and the Estate as his

3    successor) and do not run with the land.  The Estate remains liable to the ODA to complete the

4    cleanup pursuant to the terms of an "Order and Mutual Agreement" executed by the ODA and

5    the Trustee and duly authorized by the Bankruptcy Court pursuant to FRBP 9019.  The Trustee

6    made arrangements with the Buyer for post-closing non-exclusive possession of the property in

7    order to comply with the OMA, and some of that compliance work dovetails with the Buyer's

8    own plans for the property (e.g., clearing the remaining commercial trees and installing

9    additional irrigation pivots). Much work has been completed.  The formidable task of disposing

10   all of the solid and liquid dairy waste remains.  When the Trustee took over, there were tons of

11   solid waste and over 40 Million gallons of liquid dairy waste which had to  be "land applied"

12   through pivot irrigation at regulated rates.  The Trustee has already disposed of approximately

13   half of the waste in compliance with the OMA.  After consultation with his environmental

14   experts, the Trustee has budgeted another $2.3 Million to complete this clean up (including a

15   30% contingency cushion).  This budget is attached to this Disclosure Statement and labeled

16   Exhibit 2.

17       The Trustee recognizes that this is a sizable sum, but believes it represents a small

18   fraction of the Estate's potential administrative liability to the State of Oregon under the rule of

19   *Midatlantic Nat. Bank v. New Jersey Dept. of Environmental Protection*, 474 U.S. 494, 106 S.Ct.

20   755 (1986) and *In re Smith-Douglass, Inc.*, 856 F.2d 12 (4th Cir. 1988) , if the Trustee were to

21   simply abandon the property.

22                              **THE G.J. TE VELDE DAIRY**

23       The G.J. te Velde Dairy consists of approximately 1991 acres near Tipton, California.  It

24   contains the Debtor's residence.  The G.J. te Velde Dairy is a Holstein dairy, which has struggled

25   to achieve profitability before and after the Petition Date.  The G.J.te Velde Dairy is a Holstein

26   cow dairy, and Holstein dairies have been under financial stress for some time.  It appears that

the Debtor concentrated his energies on breeding at the GJT Dairy and built up a large herd. As of the Petition Date, he had approximately 11,000 head of livestock on the site, approximately half of which were productive milking cows and the balance were calves and heifers. The milking herd had poor productivity, and the feed and maintenance cost was outsized in relation to the income. After conferring with new management and consultants, the Trustee concluded that the economics of the GJT Dairy could be improved by reducing the herd size by half, performing capital improvements on the facility to increase production, and changing the feed mix. These measures resulted in improved performance for the GJT Dairy, as is shown on the attached Exhibit 3. The Trustee sold half of the GJT herd at public auction, with Court approval, and used the proceeds to pay down the blanket secured credit line held by Rabobank.

Like virtually all large dairies in the Central Valley, the GJT Dairy has a methane digester, which captures the gas from large lagoons containing the dairy waste, processes it, and allows it to be sold as a natural-gas like alternative energy source. In addition to providing free power to the GJT Dairy, this process generates outside income from the sale of these "carbon credits". It is also a requirement to maintain air quality in the area imposed by the San Joaquin Valley Unified Air Pollution Control District.

When the Trustee took over operations, the methane digester had fallen into disuse. With a modest expenditure, the Trustee arranged for it to be put back on line, and it is now generating all the power necessary to operate the dairy, a savings of approximately $300,000 per year. Further, it is generating net income from the sale of "carbon credits" which are expected to amount to at least $350,000 per year and possibly more.

Dairies are extremely high water users. The Trustee learned that as a result of major legislation known as "SGMA" [the Sustainable Groundwater Management Act], there may be significant reductions in the water available to the GJT Dairy starting in 2020. After consultation with his management and other consultants, the Trustee concluded that this may be the best time in a number of years to sell the GJT Dairy, and he listed it for sale. After considerable effort, the

1    Trustee received an acceptable cash letter of intent from a highly qualified buyer for the land only

2    in the amount of $28,750,000 with a prospective closing date of January, 2020.   This buyer

3    intends to ultimately discontinue dairy operations and convert the land to nut farming.   The

4    Trustee is diligently attempting to finalize the documentation of that transaction, at which time

5    the Buyer's identity and other details of the sale will be disclosed and Court approval for the

6    transaction will be sought.

7         The Plan is premised in part on that transaction being consummated as scheduled.  The

8    GJT Dairy land is over-encumbered.  It is subject to a first deed of trust in favor of Rabobank in

9    the amount of $24,000,000 as of the Petition Date, and a second deed of trust in favor of J.D.

10   Heiskell Holdings, LLC securing its blanket loan of approximately $8,500,000 which is cross-

11   collateralized by the Pacific Rim Dairy discussed below.  The Trustee believes that the sale of the

12   GJT Dairy at $28,750,000 will payoff the Rabobank first deed of trust and generate between

13   $1,500,000 and $2,000,000 to pay down the second deed of trust of J.D. Heiskell Holdings, LLC.

14   This will benefit unsecured creditors by freeing up equity in Pacific Rim Dairy otherwise subject

15   to  J.D. Heiskell Holdings, LLC's blanket lien.  Rabobank disputes this contention and contends

16   that the current balance of its first deed of trust is in excess of $28,500,000.  Further litigation

17   will be required to resolve this dispute.

18        The Trustee believes that he can operate the GJT Dairy profitably through the closing.  As

19   was the case with the Lost Valley Farm, shortly before the closing the Trustee expects to

20   liquidate the remaining dairy herd and equipment not included in the sale.  The GJT Dairy

21   livestock, feed, and most of its equipment are subject to the UCC-1 Financing Lien of Rabobank.

22   All of the proceeds from the sale of this personalty will be paid over to Rabobank.

23                              **THE PACIFIC RIM DAIRY**

24        The Pacific Rim Dairy consists of approximately 2700 acres near Corcoran, CA.  It

25   currently has approximately 11,000 milk and dry cows plus approximately 11,500 support stock,

26   plus various farming equipment.  The Pacific Rim Dairy has traditionally performed better than

the G.J. te Velde Dairy for a number of reasons.  First, it is a Jersey cow dairy, rather than a Holstein cow dairy.  Jersey cows require less feed and generate higher quality milk.  Second, it has a better infrastructure than the G.J. te Velde Dairy.  Third, it has significantly less leverage on its real estate than the G.J. te Velde Dairy, both in absolute numbers and on a loan-to-value basis.

The principal economic flaw of the Pacific Rim Dairy at the time of the Trustee's appointment was that it lacked a functioning methane digester.  A portion of the PRD land was acquired by the State of California for $13 Million for its well known high speed rail project.  The land taken went right through the existing digester system on the PRD.  Rather than rebuild it with the sale proceeds, the Debtor spent the $13 Million elsewhere.

In his original Schedules of Assets and Liabilities, the Debtor valued the PRD land, equipment, livestock, and feed  at approximately $67,000,000.  The Trustee believes that the current fair market value of these assets is considerably less.  After conferring with his consultants and management, the Trustee believes that the best value for PRD will be obtained through its sale as a going-concern-dairy.  The Trustee has just listed the PRD for $56,000,000, and will rely on the market to fix the true value of this asset through a sale.

The Trustee has been advised by his broker that in order to obtain the optimum price for the PRD, it will be essential to rebuild the methane digester, both from an environmental compliance standpoint but also to be able to generate additional cash flow from the sale of alternative energy credits, perhaps as much as $1.8 Million a year.  The Trustee is currently in active negotiations with an entity which will complete this project in consideration for the first share of revenues once the project is operational.  The Trustee will fully disclose the details and seek Court approval of that arrangement once the documents are finalized.

Additionally, as is the case for the GJT Dairy, the Trustee has instituted a number of managerial improvements on the PRD.  These measures resulted in improved performance for the PRD, as is shown on the attached Exhibit 4.

The PRD land is subject to a first deed of trust in favor of Golden State Farm Credit and a

second deed of trust in favor of J.D. Heiskell Holdings, LLC in the combined amounts of approximately $15,000,000.  The PRD livestock, feed, and most of its equipment are subject to the UCC-1 Financing Lien of Rabobank.  If the Trustee receives a purchase offer for the PRD which does not apportion the price between the land and the personalty, it may be necessary to litigate a declaratory relief action with Rabobank as to the correct apportionment.  However, at this point in time, the Trustee estimates that the sale of the Pacific Rim Dairy will generate a minimum of $15,000,000 for unsecured creditors.

**OTHER ASSETS OF THE ESTATE**

In addition to the three dairies, the Trustee is administering three other assets of the Debtor.

First, as of the Petition Date, the Debtor had a small fractional interest in three real estate limited partnerships established by his parents.  The Trustee is in active negotiations to sell those interests back to the family for $1,100,000, and hopes to have that transaction approved and closed by the time of Confirmation.

Second, the Debtor owned a 1974 Cessna P210N airplane, which the Trustee has recently agreed to list and which may net the Estate approximately $150,000 when sold.

Third, the Debtor owned two restored classic automobiles – a 1958 Cadillac Sedan de Ville and a 1966 Lincoln convertible.  The Trustee has placed these cars for auction, and expects to have that auction concluded and the return fixed by the time of Confirmation.

As part of his duties, the Trustee is continuing to investigate the possibility of additional assets available for creditors.  If such assets are located they will likewise be sold for the benefit of Creditors.

**THE "ESTATE RESERVED LITIGATION"**

The term "Estate Reserved Litigation" appears throughout this Disclosure Statement and the Plan.   The "Estate Reserved Litigation" is defined in the Plan to include <u>any</u> cause of action held by the Debtor or the Trustee under either the Bankruptcy Code or non-bankruptcy law.  As a

practical matter, there are three filed or anticipated litigation claims known to the Chapter 11

Trustee as of this time.  Others may be discovered, and the Plan does not limit the Trustee to the

claims described below.

The first is the pending action *Sugarman v. IRZ Consulting, LLC*,  A.P. No. 19-01033.

This is an action for breach of contract and negligence against the project manager on the

construction of the Lost Valley Farm, who the Trustee contends is liable for the serious

environmental problems and resulting loss of value created by the defective design and

construction.  The Trustee seeks damages of approximately $20,000,000.  This litigation is in its

early stages. Defendant IRZ vigorously disputes liability and has advised the Trustee that it will

seek to recover its attorneys fees against the Estate, which could be well into the six figures.

The second is a potential claim against the Debtor's ex wife Janna Crawford to avoid a

constructive fraudulent transfer.  On February 19, 2013, the Debtor executed an Agricultural

Lease for 635 acres of land near the G.J. te Velde Dairy for $202,500 per year.  The lease

contained an option to purchase the property for $6,000,000.  Shortly before April 25, 2017, the

Debtor assigned this option to his ex wife.  She proceeded to purchase the property for

$6,000.000.   At the time she purchased the property, it was worth almost $11,000,000.  The

Trustee believes that the Estate may have a claim pursuant to Bankruptcy Code Sections 548 and

550 to either recover the property itself or $5,000,000 in damages representing the difference

between the fair market value and the option strike price.

Third certain secured creditors of the Debtor are asserting onerous "default rate" interest

on their respective loans.  The Trustee contends that it is unlawful for an undersecured creditor to

claim any interest and attorneys under Bankruptcy Code Section 506(b), and that "default rate"

interest is a void penalty under non-bankruptcy law to the extent it has no relationship to the

creditor's cost of enforcement.  Further litigation may be necessary on these issues.

To reiterate, the preceding list is in no way a limitation; under the Plan the  Liquidating

Trustee  retains the power to investigate and litigate *any* claims held by the Estate against *any*

1    party.  If the Liquidating Trustee concludes that such claims are meritorious, the Plan reserves his

2    right to prosecute such claims as "Estate Reserved Litigation."

3            Creditors should be aware that any litigation recovery is time-consuming, expensive,

4    speculative and uncertain.  Any target of litigation claims is expected to vigorously dispute

5    liability.  It is a distinct possibility that the Estate could recover nothing from the Estate Reserved

6    Litigation.

7                    **SUMMARY OF THE CHAPTER 11 TRUSTEE'S PLAN**

8            The Chapter 11 Trustee's Plan of Reorganization is what is known as a liquidating plan

9    of reorganization.  A "Liquidating Trust" will be created and the Chapter 11 Trustee, or such

10   person as is appointed by the Court will serve as "Liquidating Trustee".  The Liquidating Trustee

11   will attempt to expeditiously sell the GJ te Velde Dairy and the Pacific Rim Dairy.  The Plan

12   provides for the restructuring of the secured debt on those assets pending closing of those sales.

13   The Plan also provides a back-up option in the event a sale for either dairy is not consummated

14   by allowing the Liquidating Trustee to operate the facilities  for up to four years,  or until market

15   conditions improve.

16           The current members of the Official Committee of Unsecured Creditors will serve as a

17   "Liquidating Trust Advisory Committee" to assist the Liquidating Trustee in managing the

18   tangible assets of the Estate and managing the Estate Reserved Litigation.

19           Unsecured creditors will be paid in periodic installments from unencumbered cash as it

20   accumulates.  As is laid out in greater detail below, due to numerous pending uncertainties, there

21   is a large range of the percentage dividend payable to unsecured creditors – between 26.67%  and

22   100%.  Since the high end of this is dependent upon the outcome of complex litigation, the

23   Trustee believes that the final payout will not occur before 3 - 5 years from the Effective Date.

24           Treatment of the Secured Claims described below is also complex.  Although every

25   Creditor holding a nominally Secured Claim is separately classified, under Bankruptcy Code

26   Section 506(a)(1) a Creditor is entitled to treatment as a Secured Creditor only to the extent that

there is equity in its collateral to attach to its lien.  Thus, for example, if a Secured Creditor is junior in priority to other Secured Creditors whose liens consume the entire equity in the collateral, that Creditor will be adjudicated as unsecured and treated the same as other Unsecured Creditors.  Similarly, if a Creditor has an "undersecured lien", Section 506(a)(1) operates to bifurcate that Creditor's Claim into secured and unsecured portions.   Before Section 506(a)(1) can be applied to a particular Secured Claim, there must be either (a) voluntary agreement by the Creditor in question or (b) a separate proceeding commenced by the Trustee to "strip" the lien. The Chapter 11 Trustee intends to commence and prosecute appropriate "lien-stripping" litigation against any undersecured Secured Creditor described below if an agreement cannot be reached. [3]

After all of the required Plan Distributions have been consummated, the Liquidating Trust will terminated.

The treatment of claims and interests described below applies only to Allowed Claims. Determination of the amounts due to Creditors will be after made after reconciliation of the amounts claimed by the Creditor in question with the Debtor's business records, and the resolution of the above-described litigation.  In the event of a dispute, the Liquidating Trustee will file objections to the allowance of the claim in question.

The treatment of each particular type of Creditor is described below.

**CLASSIFIED CLAIMS AND INTERESTS**

The Plan divides Claims into 13 classes.  A description of each class and its treatment under the Plan follows.

Class 1a:          Secured Claim of The County of Tulare

The County of Tulare  holds a Secured Claim for back,  unpaid real estate taxes  in the

---

[3]  In certain situations secured creditors may avoid some consequences of "lien stripping" through something called a "Section 1111(b) Election."  If a secured creditor makes a timely "Section 1111(b) Election", the Chapter 11 Trustee may be required to make an appropriate modification to this Plan prior to Confirmation.

1   approximate amount of $130,000   secured by the G.J. te Velde Dairy.   The Plan provides that

2   any such defaulted real property taxes will be repaid with interest as required by Bankruptcy

3   Code Section 511 in semi-annual installments paid over five years from the Petition Date,

4   commencing on the Effective Date.  This Class is impaired and entitled to vote on the Plan.  The

5   Trustee believes this Claim is fully secured.

6           Class 1b:        Secured Claim of The County of Tulare

7           The County of Tulare  holds a second Secured Claim for back,  unpaid real estate taxes

8   in the approximate amount of $145,000   secured by the Pacific Rim Dairy.   The Plan provides

9   that any such defaulted real property taxes will be repaid with interest as required by Bankruptcy

10  Code Section 511 in semi-annual installments paid over five years from the Petition Date,

11  commencing on the Effective Date.  This Class is impaired and entitled to vote on the Plan.  The

12  Trustee believes this Claim is fully secured.

13          Class 2a:        Secured Claim of The Lower Tule Irrigation District.

14          The Lower Tule Irrigation District  holds a Secured Claim for back,  unpaid irrigation

15  fees  in the approximate amount of $202,000   secured by the G.J. te Velde Dairy.   The Plan

16  provides that any such defaulted irrigation fees will be repaid with interest at 4% per annum in

17  semi-annual installments paid over five years from the Petition Date, commencing on the

18  Effective Date.  This Class is impaired and entitled to vote on the Plan.  The Trustee believes this

19  Claim is full secured.

20          Class 2b:        Secured Claim of The Lower Tule Irrigation District.

21          The Lower Tule Irrigation District  holds a second Secured Claim for back,  unpaid

22  irrigation fees in the approximate amount of $200,000   secured by the Pacific Rim Dairy.   The

23  Plan provides that any such defaulted irrigation fees will be repaid with interest at 4% per annum

24  in semi-annual installments paid over five years from the Petition Date, commencing on the

25  Effective Date.  This Class is impaired and entitled to vote on the Plan.

26  The Trustee believes this Claim is fully secured.

Class 3:     <u>Secured Claim of Golden State Farm Credit</u>

Golden State Farm Credit, holds a Secured Claim in the approximate amount of $6,000,000 (the precise amount is subject to dispute) collateralized by a first deed of trust on the Pacific Rim Dairy. The Plan provides that Golden State Farm Credit will be given a new promissory note secured by its existing lien. The Modified Note will bear interest at the non-default contract rate of its existing obligation as of the Petition Date, payable in monthly installments of principal and interest amortized over 40 years, but due in full in four years. If the Liquidating Trust defaults on its post-confirmation obligation, the Class 3 Creditor will be permitted to foreclose. This Class is impaired and entitled to vote on the Plan. The Trustee believes this Claim is fully secured.

Class 4a:     <u>Secured Claim of Rabobank, N.A.</u>

Rabobank, N.A., holds a Secured Claim in the approximate amount of $25,500,000 (the precise amount is subject to dispute[4]) collateralized by a first deed of trust on the G.J. te Velde Dairy. The Plan provides that Rabobank will be given a new promissory note secured by its existing lien. The Modified Note will bear interest at the non-default contract rate of its existing obligation as of the Petition Date, payable in monthly installments of principal and interest amortized over 40 years, but due in full in four years. If the Liquidating Trust defaults on its post-confirmation obligation, the Class 4a Creditor will be permitted to foreclose. This Class is impaired and entitled to vote on the Plan. The Trustee believes this Claim is fully secured.

Class 4b:     <u>Secured Claim of Rabobank, N.A.</u>

Rabobank, N.A., holds a second Secured Claim in the approximate amount of $27,000,000 (the precise amount is subject to dispute[5]) collateralized by a first position UCC-1

---

[4] Rabobank contends that it is owed approximately $29 Million on this loan.

[5] The Trustee believes that Rabobank contends that it is owed approximately $30 Million on this loan, because Rabobank has been applying the millions of dollars it has received to date

Financing Lien on all livestock, non-certificated furniture, fixtures, and equipment, and feed associated with both the G.J. te Velde Dairy and the Pacific Rim. The Plan provides that to the extent that this Claim is an Allowed Secured Claim under Bankruptcy Code Section 506(a)(1), Rabobank will be given a new promissory note secured by its existing lien. The Modified Note will bear interest at the non-default contract rate of its existing obligation as of the Petition Date, payable in monthly installments of interest only and due in full in four years. If the Liquidating Trust defaults on its post-confirmation obligation, the Class 4b Creditor will be permitted to

foreclose. This Class is impaired and entitled to vote on the Plan. The Trustee believes this Claim is secured in the approximate amount of $18,000,000, and unsecured for its balance.

Class 5:        Secured Claim of J.D. Heiskell Holdings, LLC

J.D. Heiskell Holdings, LLC holds a Secured Claim in the approximate amount of $8,500,000 (the precise amount may be subject to dispute) collateralized by second deeds of trust on the Pacific Rim Dairy and G.J. te Velde Dairy and a second position UCC-1 Financing Lien on all livestock, non-certificated furniture, fixtures, and equipment, and feed associated with both the G.J. te Velde Dairy and the Pacific Rim. The Plan provides that to the extent that the Class 5 Creditor will be given a new promissory note secured by its existing lien. The Modified Note will bear interest at the rate of five and one-half percent (5.50%) per annum, payable in monthly installments of interest only and due in full in four years. If the Liquidating Trust defaults on its post-confirmation obligation, the Class 5 Creditor will be permitted to foreclose. This Class is impaired and entitled to vote on the Plan. The Trustee believes although this Claim is completely unsecured as to its UCC-1 Financing Lien and its second deed of trust on the G.J. te Velde Dairy, it is fully secured by its second deed of trust on the Pacific Rim Dairy.

---

in this Case to default-rate interest, late charges, contract-rate interest, and attorneys fees. The Trustee contends that this is an unlawful and inappropriate accounting barred by Bankruptcy Code Section 506(b). This disputed contention will likely require further litigation to resolve.

Class 6:      <u>Secured Claim of Overland Stockyards, Inc.</u>

Overland Stockyards, Inc., holds a Claim in the approximate amount of $1,700,000 nominally collateralized by a third position UCC-1 Financing Lien on all livestock, non-certificated furniture, fixtures, and equipment, and feed associated with both the G.J. te Velde Dairy and the Pacific Rim Dairy. The Trustee believes that this Claim is entirely unsecured and will be treated as a General Unsecured Claim in Class 11. Nonetheless, to comply with the technical provisions of the Bankruptcy Code, the Plan is required to set forth a proposed treatment for the Class 6 Claim in the highly unlikely event that it is treated as a Secured Claim. Thus, the Plan provides that to the extent the Class 6 Claim is treated as an Allowed Secured Claim, the Class 6 Creditor will be given a new promissory note secured by its existing lien. The Modified Note will bear interest at the rate of four and one-half percent (4.50%) per annum, payable in monthly installments of interest only and due in full in five years. If the Liquidating Trust defaults on its post-confirmation obligation, the Class 5 Creditor will be permitted to foreclose. This Class is impaired and entitled to vote on the Plan.

Classes 7, 8, & 9:      <u>Secured Claims Against Lost Valley Farm Proceeds</u>.

Classes 7, 8, & 9 are held by Boardman Tree Farm, LLC, IRZ Consulting, LLC, and Sineco Construction, LLC, respectively, against the remaining Lost Valley Farm Sales Proceeds of approximately $950,000. IRZ Consulting, LLC claims to be owed approximately $400,000, plus attorneys fees; Sineco Construction LLC claims to be owed approximately $140,000, plus attorneys fees; and Boardman Tree Farm claims to be owed in excess of $7,000,000. The Lost Valley Farm Sales Proceeds are subject to a priority dispute among these three creditors. IRZ and Sineco hold Oregon state law construction liens and claim that they are senior in priority to Boardman, which formerly held a first deed of trust on the underlying real property. If IRZ and Sineco are correct and their underlying claims are valid, they will be paid in full from the Lost Valley Farm Sales Proceeds, and any remaining balance will go to satisfy the Secured Claim of Boardman. The balance of Boardman's Claim will be an unsecured deficiency claim treated as a

Class 11 General Unsecured Claim.  If Boardman is correct that its deed of trust is senior, it will receive the entire balance of the Lost Valley Farm Sales Proceeds.  Again,  the balance of The balance of Boardman's Claim will be an unsecured deficiency claim treated as a Class 11 General Unsecured Claim.  Likewise, in this event, the entire amount due IRZ will be treated as Class 11 General Unsecured Claim.   Sineco is barred from treatment as a Class 11 General Unsecured Creditor, since it wilfully failed to file a timely Proof of Claim in an effort to escape jurisdiction of the Bankruptcy Court.

To the extent that these claims are Allowed Secured Claims, they are unimpaired and not entitled to vote on the Plan.  To the extent that these claims are Allowed Unsecured Claims, they are entitled to vote as Class 11 General Unsecured Creditors.

Class 10:          Priority Claims for Wages and  Employee Benefits.

Bankruptcy Code Section 507(a)(4) provides that unsecured claims for wages, salaries or commissions, including vacation, severance and sick leave pay earned within 180 days before the date of the filing of the Petition, in an amount not to exceed $12,850 for each individual, are entitled to priority.   Bankruptcy Code Section 507(a)(5) provides a priority for unpaid contributions to employee benefit plans arising from services rendered within 180 days before the date of the filing of the Petition,, also with certain monetary limitations thereon.  The Plan provides that these claims will be paid in full on the Effective Date.  The Trustee believes that the allowable amount of these Claims totals $22,981.76.  This class is unimpaired and not entitled to vote on the Plan.

Class 11:          Claims of General Unsecured Creditors .

General Unsecured Creditors  will be paid periodic annual dividends from the proceeds of the liquidation of the assets of the Estate, after payment of all Allowed Unclassified Claims, Allowed Priority Claims, and Allowed Secured Claims.  There are three sources for payment of Allowed General Unsecured Claims, in order of certainty: (1) proceeds of sale from the Pacific Rim Dairy in the approximate amount of $15,000,000 remaining after payment of all Secured

Claims collateralized by those assets; (2) proceeds of sale of unencumbered assets of the Debtor in the approximate amount of $2,000,000; and (3) proceeds of the recovery from the Estate Reserved Litigation, which could range between zero and $22,000,000. Thus, the Trustee estimates that the range of value of assets available for unsecured creditors will be between a low of $15,000,000 and a high of $39,000,000.

The total amount of Allowable General Unsecured Claims is likewise uncertain at this time and may require substantial additional litigation to fix. The Trustee believes that the minimum amount of Allowable General Unsecured Claims is approximately $27,000,000. However, this does not include two unliquidated employment law related tort claims in the filed amount of $2,600,000, any unsecured deficiency claim for IRZ, or any unsecured deficiency claim for Rabobank which could be in excess of $10,000,000. Thus, the Trustee estimates that the range of liabilities represented by the unsecured creditors is between $27,000,000 and almost $40,000,000.

This translates into an estimated dividend ranging between 26.67% and 100%.

Allowed Unsecured Claims are entitled to payment of the full amount of their Allowed Claims with interest at the Legal Rate, until the assets of the Liquidating Trust are exhausted. Any surplus remaining will be paid over to the Debtor. This Class is impaired and entitled to vote on the Plan.

Class 12:        Administrative Convenience Claims.

Bankruptcy Code Section 1122(b) provides that small claims may be separately classified and paid to avoid the time and expense of calculating multiple small dividends. Class 12 consists of such Allowed Claims in the amount of $5,000, or less. The Plan provides that these Claims will be paid in full on the Effective Date. The Trustee believes that the allowable amount of these Claims totals approximately $8,000.00. This class is unimpaired and not entitled to vote on the Plan.

Class 13:        The Interest of the Debtor

Class 13 is the Interest of the Debtor.  The Plan provides that the Debtor will retain his exempt property and any surplus of the Estate after all Allowed Claims and expenses are paid in full.  The Trustee believes that it is  unlikely that there will be any surplus.  This class is unimpaired and not entitled to vote on the Plan.

**UNCLASSIFIED CLAIMS**

Section 1123(a)(1) of the Bankruptcy Code provides that certain claims, including claims for post-petition administrative expenses (including professional fees) and certain claims by governmental units for taxes, are not classified under the Plan.   Entities holding unclassified claims are not entitled to vote on the Plan.

Any unpaid professional fees incurred up through Confirmation will be paid if and when allowed by the Court pursuant to Bankruptcy Code Section 330.  The Chapter 11 Trustee 's counsel estimates that there will be accrued and  unpaid professional fees for all parties of approximately $300,000 as of the Effective Date of the Plan, though this number could be greater or lesser depending upon whether there is litigation over confirmation of the Plan.  All other post-petition administrative expenses, including quarterly fees due or to become due to the United States Trustee will be paid as of the Effective Date of the Plan.

There is a broad range of potential liability for unpaid non-tax administrative expenses, other than professional fees.   The Chapter 11 Trustee believes that these unpaid non-tax administrative expenses will be approximately  $300,000, consisting primarily of the Allowed Administrative Expense Claims of Pascoe Farming and the Oregon Department of Agriculture.  Additionally, there is a disputed $8,000,000 +/-  Administrative Expense Claim asserted by Soleseco, LLC arising out of its construction and discontinued use of a 6 acre concrete pad on the Lost Valley Farm.  The Trustee disputes that the Estate has any liability to Soleseco, and further contends that in the unlikely event that there is such liability, the amount owing is not entitled to administrative priority treatment and it is far less than $8,000,000.

The plan provides that all pre-petition tax claims entitled to priority under Bankruptcy

Code Section 507(a)(8) will receive deferred cash payments over a period not to exceed five years after the Petition Date, which is the minimum treatment required by Bankruptcy Code Section 1129(a)(9)(C). Tax claims will bear interest at the rate specified in Section 6621 of the Internal Revenue Code. The Chapter 11 Trustee believes that the Debtor owes priority unpaid state and federal taxes of approximately $54,000.

**OTHER PROVISIONS OF THE CHAPTER 11 TRUSTEE'S PLAN**

The Chapter 11 Trustee's Plan contains a number of other provisions concerning its implementation. The following is a summary. Consult the Chapter 11 Trustee's Plan itself for details.

　　　1.　　Post Confirmation Management.

Following the Confirmation, the general role of the Liquidating Trustee will be to oversee day-to-day operation of the dairies, arrange for their sale when appropriate, manage all Estate Reserved Litigation and Contested Matters arising out of the Estate or the Plan, make required Distributions under the Plan, and to close the Liquidating Trust when all assets are exhausted and all final Distributions are made.

The Liquidating Trustee will be compensated on the statutory commission of a Chapter 7 Trustee as set forth in Bankruptcy Code Section 326(a); i.e., 3% of the amount of disbursements to creditors. This could result in a fee to the Liquidating Trustee of between $3,000,000 and $4,000,000.

　　　2.　　Administrative Powers.

The Trustee's Plan confers broad administrative powers on the Liquidating Trustee. These include the power to prosecute all litigation claims belonging to the Estate or the Debtor. Consult the Plan for details.

　　　3.　　Post-Confirmation Compensation and Reimbursement of Professionals.

The Liquidating Trustee and his professionals shall be entitled to payment of their post-Confirmation fees and reimbursement of expenses without the necessity of Court approval. Pre-

1  confirmation compensation remains subject to the noticed motion requirements of Bankruptcy

2  Code Section 330.

3                          4.        <u>Executory Contracts</u>.

4        Bankruptcy Code Section 365 gives special consideration to "executory contracts",

5  which are contracts requiring ongoing performance of both the Debtor and the other party to the

6  contract.  The Chapter 11 Trustee's Plan provides that any such executory contract which exists

7  is deemed accepted as of the Effective Date, except for executory contracts between the Debtor

8  and any Insider, which are deemed rejected.  However the Chapter 11 Trustee's Plan further

9  provides that this designation may be changed and that any executory contract may be assumed

10  or rejected up through the time of Confirmation.  If there is a rejected executory contract is

11  timely rejected by the Debtor, the holder of the contract right may have a "Rejection Claim" as

12  defined in the Plan and subject to the deadlines and treatment specified therein.

13                          5.        <u>Distributions and Claims</u>.

14        Subject to the deadlines in the Plan, distributions will be made to a given Creditor when

15  its Claims are Allowed Claims, as defined in the Plan.  Proofs of Claim, when required, must be

16  filed with the Bankruptcy Court no later than the applicable Claims Bar Date (which for most

17  prepetition Claims was September 4, 2018) or the applicable Governmental Unit Claims Bar

18  Date for prepetition tax and similar Claims (November 3, 2018).  However, Bankruptcy Rule

19  3001(b) provides that it is not necessary for a Creditor to file a proof of Claim if its Claim has

20  been listed on the Debtor's Schedules filed with the Bankruptcy Court pursuant to Section

21  521(a)(1) of the Bankruptcy Code and Rule 1007(a)(3) of the Bankruptcy Rules, and is not listed

22  as disputed, contingent, unliquidated or unknown as to amount.   Except as provided by the Plan

23  or as otherwise permitted by the Bankruptcy Court, the Bankruptcy Rules or applicable law, upon

24  expiration of the applicable bar date, proofs of Claim may not be filed or amended unless the

25  amendment is solely to decrease the amount or priority.  Distributions to Creditors under the Plan

26  will be made to the Persons shown on the Debtor's Schedules or the Bankruptcy Court's records

on the Effective Date, unless Creditors file an appropriate change of address or assignment of claim with the Bankruptcy Court.

Objections to any Claim may be filed by any party in interest and shall be filed no later than the Claims Objection Date, which is defined in the Plan as 180 days after the Effective Date.

### 6.    Reservation of Litigation Rights.

Under the Plan, the Estate is reserving all litigation rights and defenses against all Creditors and any third party,  including without limitation (1) any claims and causes of action under the Bankruptcy "avoidance statutes" and all other claims which are vested in the Estate pursuant to Bankruptcy Code Sections 502, 506, 510, 542, 542, 543, 544, 545, 547, 548, 549, 550, and 553,k (the "Estate Reserved Litigation") and (2) the right to object to any Claim, even if the Creditor in question votes to accept the Plan.  All litigation claims owned by the Estate or the Debtor will be pursued exclusively by the Trustee.  The failure of this Disclosure Statement to disclose or discuss any particular potential Claim objection, cause of action or claim for relief held by the Debtor or the Estate is not and shall not be construed as a settlement, compromise, waiver, or release of any such Claim objection, cause of action or claim for relief.  **The Claim of any Creditor is subject to objection by a party in interest  and disallowance by the Court, even if that Creditor votes in favor of the Plan.**

### 8.    Retention of Jurisdiction.

The Plan provides that the Bankruptcy Court shall retain broad jurisdiction under the Bankruptcy Code to adjudicate any disputes arising out of the Plan, the administration of the Cases, and claims for relief held by theTrustee .

### 9.    Persons Bound/Discharge.

Confirmation of the Plan binds the Debtor, any entity acquiring property under or otherwise accepting the benefits of the Plan, and every Creditor, whether or not such Creditor has filed a proof of Claim, whether or not the Claim of such Creditor is impaired under the Plan, and whether or not such Creditor has accepted or rejected the Plan.

The Confirmation Order shall further operate as a temporary "channeling injunction" to bar Creditors from taking any action to pursue their Claims against the Liquidating Trust outside of what is distributed through the Plan.

Creditors may or may not be able to pursue their Claims against post petition personal services income of the Debtor, or other assets the Debtor acquired post-petition; e.g., through a post-petition inheritance. This depends on whether the Debtor obtains a permanent "discharge" of his Debts pursuant to Bankruptcy Code Section 1141(d)(4) & (5). The Bankruptcy Code and the Plan set forth requirements for the Debtor to obtain a discharge. Whether that occurs is largely outside the purview of the Trustee.

## FEASIBILITY OF THE CHAPTER 11 TRUSTEE'S PLAN

Successful consummation of the Plan is not certain. Nonetheless, the Trustee believes that the Plan meets the feasibility test of Bankruptcy Code Section 1129(a)(11). The specific contingencies to the success of the Plan include the following:

First, the amount of the Allowable Administrative Claims must be kept at a reasonable level. Allowed Administrative Claims must be paid in full in cash on the Effective Date unless the claimant in question agrees otherwise. The Trustee believes that he will have more than sufficient cash on hand required to the pay the undisputed Administrative Expenses. However, as noted above, Soleseco LLC has asserted an $8,000,000 administrative claim. If Soleseco's adminstrative claim is allowed in some seven-figure amount, it is unlikely that the Trustee will have sufficient cash to pay that claim on the Effective Date.

Second, the revenues from the dairies must be sufficient to pay all operating expenses and pay the restructured debt service due the Allowed Secured Claims pending the sale of the respective dairy assets. This is a complicated projection dependent in part on fluctuating milk and other commodity prices. Also, there is no assurance that the restructured secured debt proposed by the Plan will be confirmed by the Bankruptcy Court. Under the U.S. Supreme Court's decision in *Till v. SCS Credit Corp*., 541 U.S. 465, 124 S.Ct. 1951 (2004), it is very

possible that the Court could require a higher interest rate or different amortization schedule as a

condition of confirmation, which would result in infeasible debt service.  However, assuming the

Plan as drafted is confirmed, the Trustee believes that it will result in total aggregate monthly

debt service of approximately $260,000 pending sale of both dairies.  On sale of the GJT Dairy,

monthly debt service will drop to approximately $110,000, pending sale of the PRD Dairy.  If

commodity prices remain relatively stable, the Trustee believes that he can make those debt

service payments.

Third, there must be little or modest capital gains tax due from the three dairies for their

to be a meaningful return to unsecured creditors.  Post-petition tax liabilities are entitled to

administrative priority and must be satisfied in full before any payment is made to general

unsecured creditors.  The Trustee believes that the Debtor incurred a tax loss on the sale of the

Lost Valley Farm in the approximate amount of $30 Million.  The Trustee further believes that

this loss will offset any gain incurred by the Estate on the sale of the GJT Dairy and the PRD

Dairy.  However, creditors should be aware that no tax returns have yet been prepared and this is

a complex issue requiring further investigation and analysis.

### V.  ALTERNATIVES TO THE CHAPTER 11 TRUSTEE'S PLAN

A.    Chapter 7 Liquidation

In a hypothetical Chapter 7 liquidation proceeding, the Debtor's interest in any assets of

the Estate would vest in a Chapter 7 trustee, who would shut the dairies  down and either (1)

release all of the remaining assets to the respective secured creditors or (2) attempt to  sell those

assets to third parties and distribute any proceeds remaining after pay off of the Secured Creditors

to the other  creditors of the estate under the priorities established by Bankruptcy Code Section

507.  Chapter 7 liquidation is not a viable alternative to the Plan in this particular case.  Because

the Debtor is a "farmer" under the definition set forth in the Bankruptcy Code, the case cannot be

converted to Chapter 7 absent his consent.

The Trustee believes that the Plan is significantly more beneficial to Creditors and other

parties in interest than Chapter 7 for three reasons.

First, the Plan enables the Trustee to generate profits to pay creditors through the ongoing operation of the dairies.  This cannot be done in a Chapter 7.

Second, it is virtually certain that General Unsecured Creditors would receive nothing in a Chapter 7 liquidation.  All of the assets of the Estate are subject to senior,  duly perfected liens in favor of Golden State Farm Credit, J.D. Heiskell Holdings, LLC, Rabobank, N.A., and Overland Stockyards, Inc. in the combined amount of approximately $85 Million.  The Trustee believes that the liquidation value of the Debtor's assets is considerably less than that, making it highly likely that unsecured creditors will receive nothing in a Chapter 7 liquidation.

Third,  the continued operation of the Debtor's remaining two dairies  through the Plan, even for a short time,  provides a source of ongoing business to those trade creditors continuing to provide goods and services to the Estate.

B.    No Other Plans

The Bankruptcy Code permits different parties to propose competing plan of reorganization under certain circumstances.  The Chapter 11 Trustee's Plan is the only Plan which has been proposed at this time.

C.    Dismissal of the Chapter 11 Case

Another possible alternative is dismissal of the Chapter 11 Case.  Pursuant to Bankruptcy Code Section 1112, the Bankruptcy Court has the power to dismiss a Chapter 11 Case on the motion of a party in interest, after notice and a hearing, if the Court determines that this relief is in the best interests of creditors.  If the Chapter 11 Case is dismissed, Creditors may pursue state law remedies against the Debtor as if the Case had never been filed.

The Chapter 11 Trustee contends that dismissal is neither a realistic nor a beneficial alternative for a number of reasons.

First, the Trustee contends that it is virtually impossible for a party in interest to successfully move for dismissal of a Chapter 11 Case when other parties in interest object and/or

do not affirmatively asset.  The Trustee believes that a number of parties would object to such a

motion in the instant case.

Second, dismissal of the Chapter 11 Case impairs the ability of parties in interest to

benefit from any recovery by the Trustee in connection with the Estate Reserved Litigation.

Finally, traditionally bankruptcy permits the orderly and equitable division of a debtor's

assets among all creditors.  Outside of bankruptcy, only creditors willing to fund expensive

collection efforts can effectively collect from the Debtor.

## VI.  FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

Each Creditor should consult its own tax advisors concerning any income tax

consequences of its respective treatment under the Plan.  The tax consequences of the Plan to the

Estate are discussed in the Feasibility section of this Disclosure Statement.

## VII.  VOTING, ACCEPTANCE AND CONFIRMATION

A.    In General.

The Hon. Fredrick Clement, Judge, United States Bankruptcy Court, has set a date for the

hearing on the Confirmation of the Plan. The hearing is to held at the United States Bankruptcy

Court, 2500 Tulare St., Courtroom 11, Fifth Floor, Fresno, CA 93721.  The Plan can be

implemented only if accepted by the requisite percentage of creditors and confirmed by the

Bankruptcy Judge.  Creditors entitled to vote  should vote on the Plan by filling out and mailing

the accompanying ballot to  counsel.  There is no assurance that, if accepted, the Plan will be

confirmed by the Bankruptcy Judge.

B.    Voting.

Only impaired classes under the Plan will be entitled to vote on the Plan.    The definition

of an "impaired" class of Creditors is set forth in  Section 1124 of the Bankruptcy Code.  Classes

1, 2, 3, 4, 5, 6, and 11  are impaired by the Plan and entitled to vote.  No other Classes are

impaired under the Plan.  Pursuant to Section 1126(f) of the Bankruptcy Code, a class that is not

impaired under the Plan, and each holder of a Claim of such class, are conclusively presumed to

have accepted the Plan, and solicitation of acceptances with respect to such class from the holders of Claims or Interests of such class is not required. The Bankruptcy Code defines "acceptance" of a plan by a class of Creditors as acceptance by the holders of two-thirds (2/3) in dollar amount and more than one-half (½) in number of the claims of that class which actually cast ballots for acceptance or rejection of the Plan.

In addition to the requirement that a Creditor be in an "impaired class", in order for a creditor's vote to be counted, either for or against the Plan, the creditor must have either (1) filed a Proof of Claim on or before the "Claims Bar Date", which was previously set by the Court at September 4, 2018, and not be subject to an Objection to Claim filed by the Trustee; or (2) have been listed by the Debtor in the Schedule of Liabilities as having a claim which was noncontingent and undisputed.

**IF YOU HAVE ALREADY FILED A CLAIM YOU NEED NOT REFILE FOR THE PURPOSE OF VOTING ON THE PLAN.**

If a Creditor wishes to vote for or against the Plan, the Creditor should complete an acceptance or rejection of the Plan on the form ballot enclosed herewith which must be returned pursuant to the instructions set forth thereon.

C.     <u>Confirmation</u>

If no impaired Creditor classes accept the Plan, it cannot be confirmed. If at least one impaired class of Creditors accepts the Plan, the Court will hold a Confirmation Hearing. At the Confirmation hearing , the Bankruptcy Judge has the duty to determine whether the Plan meets the requirements of Section 1129 of the Bankruptcy Code. The principal requirements of Section 1129 include the following: (1) that the proponents of the Plan have complied with the applicable provisions of the Bankruptcy Code on all matters connected with the case; (2) that the Plan has been proposed in good faith, and not by any means forbidden by law; (3) that the requisite amount of creditors have accepted the Plan or that the creditors are receiving an amount not less than they would receive if liquidation under Chapter 7 took place; (4) that at least one class of

Creditors has accepted the Plan; and (5) that confirmation of the Plan is not likely to be followed by liquidation, or the need for further financial reorganization of the debtor; and (6) that the Debtor and the Plan in all other respects comply with applicable law.  Only if such determinations are made will the Judge confirm the Plan.

If there are impaired Creditor classes which have rejected the Plan, the Bankruptcy Judge may order Confirmation over its rejection, but only if the Judge first determines that  the rights of non-consenting classes of creditors are protected under Bankruptcy Code Section 1129(b) and other applicable law.  The Chapter 11 Trustee reserves the right to seek confirmation under Bankruptcy Code Section 1129(b) of this Plan.

        D.    <u>Modification of the Plan</u>.

The Chapter 11 Trustee  may propose amendments to or modifications of the Plan under Section 1127(a) of the Bankruptcy Code and Bankruptcy Rule 3019 at any time prior to the conclusion of the hearing on Confirmation of the Plan.  After the Confirmation Date, the Liquidating Trustee  may modify the Plan in accordance with Section 1127(b) of the Bankruptcy Code and Bankruptcy Rule 3019.   All parties in interest shall retain the right to object to any modification of the Plan.

### VIII.  CONCLUSION

The Chapter 11 Trustee believes that his Plan of Reorganization realistically affords to Creditors their best opportunity for receiving a prompt, meaningful dividend.  The Chapter 11 Trustee respectfully request Creditors vote to accept the Chapter 11 Trustee's Plan.

Dated: May 3, 2019

                              /s/ Randy Sugarman
                              Randy Sugarman, Chapter 11 Trustee

Dated: May 3, 2019                     MacCONAGHY & BARNIER, PLC

                              /s/ John H. MacConaghy
                              By John H. MacConaghy
                              Attorneys for the Chapter 11 Trustee