48
MacCONAGHY & BARNIER, PLC
JOHN H. MacCONAGHY, SBN 83684
JEAN BARNIER, SBN 231683
645 First St. West, Suite D
Sonoma, California 95476
Telephone: (707) 935-3205
Email:    macclaw@macbarlaw.com

Attorneys for Chapter 11 Trustee
RANDY SUGARMAN

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

| | |
|---|---|
| In re | Case No. 18-11651 |
| | (Chapter 11) |
| GREGORY JOHN Te VELDE | |
| | **DCN: MB-44** |
| | **DISCLOSURE STATEMENT** |
| | **FOR CHAPTER 11 TRUSTEE'S** |
| Debtor. | **PLAN OF REORGANIZATION** |
| | **[DATED AUGUST 5, 2019]** |

THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE UNITED STATES BANKRUPTCY COURT FOR THE EASTERN DISTRICT OF CALIFORNIA AS CONTAINING ADEQUATE INFORMATION AS REQUIRED BY THE BANKRUPTCY CODE FOR SOLICITATION OF ACCEPTANCES OF THE CHAPTER 11 PLAN OF REORGANIZATION DATED AUGUST 5, 2019, AND FILED BY THE CHAPTER 11 TRUSTEE IN THIS PROCEEDING. HOWEVER, APPROVAL OF THE DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN ENDORSEMENT OF THE PLAN BY THE COURT. THE COURT HAS MADE NO INDEPENDENT INVESTIGATION OR DETERMINATION OF ANY FACTUAL STATEMENTS OR DOLLAR VALUES SET FORTH IN THE PLAN OR THE DISCLOSURE STATEMENT.

**<u>TABLE OF CONTENTS</u>**

I. EXECUTIVE SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    Who is Proposing this Plan ? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    Why Unsecured Creditors Should Vote for this Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    How to Vote on the Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    Disclaimer of Financial Information Provided by the Debtor. . . . . . . . . . . . . . . . . . . . . . 6

II. FACTUAL AND PROCEDURAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    The Lost Valley Farm . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    The G.J. te Velde Dairy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    The Pacific Rim Dairy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    Cash Collateral . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    Other Assets of the Estate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    The "Estate Reserved Litigation" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

III.   SUMMARY OF THE CHAPTER 11 TRUSTEE'S PLAN . . . . . . . . . . . . . . . . . . . . . . . 20

    Classified Claims and Interests . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

        Class 1a.  Secured Claim of County of Tulare . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

        Class 1a.  Secured Claim of County of Tulare . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

        Class 2a  Secured Claim of Lower Tule Irrigation District . . . . . . . . . . . . . . . . . 23

        Class 2b  Secured Claim of Lower Tule Irrigation District . . . . . . . . . . . . . . . . . 23

        Class 3    Secured Claim of Golden State Farm Credit . . . . . . . . . . . . . . . . . . . . . 23

        Class 4a  Secured Real Estate Claims of Rabobank, N.A.. . . . . . . . . . . . . . . . . . 24

        Class 4b  Secured "Herd and Feed" Claim of Rabobank, N.A. . . . . . . . . . . . . . 25

        Class 5    Secured Claim of J.D. Heiskell Holdings, LLC . . . . . . . . . . . . . . . . . . 25

        Class 6    Secured Claim of Overland Stockyards, Inc.  . . . . . . . . . . . . . . . . . . 26

        Classes 7, 8 & 9    Secured Claims Against Lost Valley Farm Proceeds  . . . . . . 27

        Class 10  Priority Claims for Wages and Employee Benefits. . . . . . . . . . . . . . . 27

Class 11    General Unsecured Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Class 12       Administrative Convenience Claims . . . . . . . . . . . . . . . . . . . . . . . . . 29

Class 13       The Interests of the Debtor. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Unclassified Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

1.  Administrative Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

2.  Prepetition Tax Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Other Provisions of the Chapter 11 Trustee's Plan. . . . . . . . . . . . . . . . . . . . . . . . 32

1.  Post-confirmation Management. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

2.  Administrative Powers. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

3.  Post-confirmation Compensation and Reimbursement of Professionals. . . . . 33

4.  Executory Contracts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

5.  Distributions and Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

6.  Reservation of Litigation Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

7.  Retention of Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

8.  Persons Bound/Discharge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

IV.     FEASIBILITY OF THE CHAPTER 11 TRUSTEE'S PLAN . . . . . . . . . . . . . . . . . . . 37

V.      ALTERNATIVES TO THE PLAN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

A.      Chapter 7 Liquidation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

B.      No Other Plans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

C.      Dismissal of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

VI.     FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN . . . . . . . . . . . . . . . . 40

VII.    VOTING, ACCEPTANCE, AND CONFIRMATION. . . . . . . . . . . . . . . . . . . . . . . . 44

A.      In General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

B.      Voting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

C.      Confirmation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

1

D.　　　Modification of the Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

2

VII.  CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

# I. <u>EXECUTIVE SUMMARY</u>

This Disclosure Statement has been prepared by Randy Sugarman, the Court appointed Chapter 11 Trustee[1] in this bankruptcy case (the "Chapter 11 Trustee ") to give Creditors sufficient information to intelligently vote on the accompanying Chapter 11 Trustee's Plan of Reorganization.   Creditors should consult their own advisors before making a decision on how to vote.

### WHO IS PROPOSING THIS PLAN ?

This Plan is proposed by Randy Sugarman, the Chapter 11 Trustee of the Estate of Gregory J. Te Velde.  The Chapter 11 Trustee is a certified public accountant and court-supervised professional fiduciary nominated by the Office of the U.S. Trustee, a component of the U.S. Department of Justice, to take over the management of this case.  Mr. Sugarman was appointed on the Order of the Bankruptcy Court made pursuant to Bankruptcy Code Section 1104, and after a noticed hearing on the Motion to Appoint Chapter 11 Trustee filed by the Office of the United States Trustee.  One of the jobs of a Chapter 11 Trustee is to formulate a Chapter 11 Plan, if appropriate.

Most Chapter 11 Plans are proposed by the debtor; i.e., the bankrupt entity.  In this case, however, the Chapter 11 Trustee has proposed his own Plan because he believes it will result in an efficient and timely return for Creditors.

### WHY UNSECURED CREDITORS SHOULD VOTE FOR THIS PLAN

In the Chapter 11 Trustee 's opinion, all unsecured Creditors should vote for this Plan, because it will result in the orderly liquidation of the Debtor's assets and the continuation of the Debtor's remaining dairies  as a going concern in the interim, the oversight of the Debtor's assets by a professional fiduciary, and the timely payment of the best feasible dividend on creditor claims.  In the Chapter 11 Trustee's opinion, the only viable alternative to the Plan is dismissal of

---

[1]  Capitalized terms used in this Disclosure Statement are defined in the accompanying Plan of Reorganization.

the case or surrendering all assets to the secured creditors, in which case unsecured Creditors will likely get nothing.

### HOW TO VOTE ON THE PLAN

An acceptance or rejection of the Plan may be voted by completing the ballot which accompanies the Plan and mailing, faxing, or emailing it to MacConaghy & Barnier, PLC, attorneys for the Chapter 11 Trustee, 645 First Street West, Ste. D., Sonoma, California 95476, facsimile: (707) 935-7501, macclaw@macbarlaw.com.

### DISCLAIMER OF FINANCIAL INFORMATION PROVIDED BY THE DEBTOR

In order to comply with requirements of Bankruptcy Code Section 1125 concerning the adequacy of Disclosure Statements, the Chapter 11 Trustee as a Plan proponent must provide the best available financial information concerning the Debtor. Some of the financial information contained in this Disclosure Statement comes from unaudited data under the Debtor's control and covers time periods prior to the Chapter 11 Trustee's appointment. The Chapter 11 Trustee cannot independently verify the accuracy of this information.

### II. <u>FACTUAL AND PROCEDURAL BACKGROUND</u>

The Debtor Gregory J. te Velde is an individual who grew up in the dairy business and as of the filing of his Chapter 11 case owned three large dairies – two in Tulare County, California (G.J. te Velde Dairy and Pacific Rim Dairy) and one in Boardman, Oregon (Lost Valley Farm). Mr. te Velde filed Chapter 11 bankruptcy on April 26, 2018 due to a combination of falling milk prices, over-leverage, environmental problems at the Lost Valley Farm, and mismanagement of his dairy operations. Mr. te Velde remained in control of his affairs as a Chapter 11 "debtor-in-possession" up through September 21, 2018. At that time, Randy Sugarman was appointed as Chapter 11 Trustee pursuant to Bankruptcy Code Section 1104 due to various allegations of post-petition mismanagement by te Velde. Since then, Mr. Sugarman has assumed complete control over all assets and operations of te Velde by operation of law.

A summary of the income and disbursements in this Chapter 11 case is set forth in the

1  summary pages of the most recent Monthly Operating Report for the Estate, which is attached to

2  this Disclosure Statement and labeled Exhibit 1.

3      The assets and liabilities of the Estate are discussed in narrative form below.  This

4  narrative contains certain factual statements and unadjudicated legal opinions  concerning the

5  Claims of Rabobank and other parties who are adverse to general unsecured creditors.  The

6  Trustee and his professionals genuinely believe these statements and legal opinions  are correct.

7  Rabo AgriFinance, LLC and the other adverse parties vigorously disputes many of these

8  statements.  The principal disagreements of these adverse parties are also set forth below to

9  enable other creditors and their advisors to make an informed decision on whether to accept the

10  Trustee's Plan.

11                                          **THE LOST VALLEY FARM**

12      The largest dairy owned by the Debtor as of the Petition Date, since sold by the Trustee,

13  is the 7300 +/- acre Lost Valley Farm.  The Debtor purchased the Lost Valley Farm in

14  November, 2015 from Boardman Tree Farm, LLC for $65 Million, paid with a $10 Million cash

15  down payment and a $55 Million purchase money deed of trust.  There was no dairy on the site

16  when the Debtor purchased it; instead about half of it was used as a commercial tree farm.  He

17  then spent millions of dollars attempting to develop the Lost Valley Farm into a state of the art

18  dairy, and developing the tree farm into irrigated crop land.  As best the Trustee can determine,

19  most of that money was either borrowed from the Debtor's lenders against borrowing bases

20  established by his two California dairies or obtained by stretching out trade creditors.

21      The Lost Valley Farm is located in an environmentally sensitive area in the Columbia

22  River Basin.  To operate it, the Debtor was required to obtain a "CAFO" permit [Confined

23  Animal Feeding Operation] from the Oregon Department of Agriculture ["ODA"].  Essentially,

24  the CAFO required the Lost Valley Farm to be a self-contained system in which the effluent from

25  the large dairy herd was all captured and contained on impermeable surfaces, then processed to

26  fertilize the thousands of acres of available land to grow dairy feed to nourish the animals.

Unfortunately, the system was poorly designed and constructed when the Debtor commenced operations. Thus, the effluent did not properly drain from the dairy stalls, effluent leaked from various parts of the waste management system, the irrigation pivots used to "land apply" the liquid waste were inadequate and incorrectly placed, and, most importantly, there was insufficient cleared land on which to place the required amount of effluent; i.e., several thousand acres of land still contained trees and tree stumps which needed to be cleared before the system could operate at full capacity.

All of this resulted in very aggressive litigation and administrative enforcement actions against the Lost Valley Farm by the ODA and the Oregon Attorney General's office resulting in civil contempt proceedings, fines, and a revocation of the CAFO. Due in part to the highly negative publicity generated by the Debtor's environmental law violations, the principal customer of the Lost Valley Farm – the Tillamook co-op dairy – declared a default in its long-term supply contract with the Debtor.

After concluding that it would take an additional $35 - $40 Million to develop the Lost Valley Farm into a viable operation, and with no source of funds to do so, the Trustee concluded that it was in the best interests of the Estate to liquidate the Lost Valley Farm. With Bankruptcy Court authorization, the Trustee auctioned off the entire cattle herd in phases, concluding this by the end of February, 2019. The proceeds of this livestock sale were used to pay off the holders of unpaid Oregon Statutory Agricultural Service Liens in the approximate amount of $2,000,000, and the balance of approximately $8,000,000 was used to pay down the blanket UCC-1 secured loan of Rabo AgriFinance, LLC, [2] Also with Bankruptcy Court authorization, through an order

---

[2] Rabo AgriFinance, LLC, is the successor to Rabobank, N.A. It has three secured loans, which are discussed in greater detail below. The first two are real estate loans in the combined approximate amount of $24,000,000 as of the Petition Date, secured by first and second deeds of trust on the G.J. te Velde Dairy. The third is a personal property/operating "Herd & Feed Loan" in the approximate amount of $44,000,000 as of the Petition Date, secured by all livestock, feed, growing crops, farming equipment and other personalty on all three dairies, as well as possibly other assets of the Debtor.

1    entered on February 11, 2019 (Dkt. No. 1607), the Trustee sold all of the land, farming

2    equipment, and other assets located at Lost Valley Farm to Canyon Farm, LLC for the sum of

3    approximately $66,734,000.00. That sale closed on March 1, 2019. Some of the net sales

4    proceeds were used to pay off all outstanding real property taxes and the holders of all purchase

5    money equipment liens on the Lost Valley Farm equipment in the aggregate amount of

6    approximately $2,200,000. Initially after the sale, the remaining sale proceeds were held by the

7    Trustee pending further order of the court. These funds were held because multiple creditors

8    asserting competing liens in the sale proceeds. Soon after approval of the sale, through an order

9    entered on March 6, 2019 (Dkt. No. 1708), the Court approved a Settlement Agreement and

10   Mutual Releases ("Boardman Settlement Agreement") between the Trustee and Boardman. The

11   Boardman Settlement Agreement provides, among other things, that Boardman has an allowed

12   secured claim in the case in the amount of $62 million ("Boardman Allowed Secured Claim"),

13   additionally Boardman has an allowed general unsecured claim in the amount of $1 million

14   ("Surrender Agreement Claim"), and that the portion of the Boardman Allowed Secured Claim

15   which is not satisfied with proceeds of the sale of the Lost Valley Farm assets ("LVF Sale

16   Proceeds") is an allowed unsecured deficiency claim ("Boardman Allowed Deficiency Claim")

17   which is to receive pro rata and simultaneous distributions with all other allowed general

18   unsecured claims, including the Surrender Agreement Claim. [3] Thereafter, the court issued its

19   Order Granting Trustee's Motion for Approval of a "Stipulated Agreement for Provision of

20   Adequate Protection and Disbursement of Funds from Blocked Account" ("AP Order") entered

21   March 25, 2019 (Dkt. No. 1799). In accordance with the AP Order, the following distribution of

22   the LVF Sales Proceeds were made: $500,000 was deposited into a reserve ("ODA Reserve") in

23   accordance with the Order and Mutual Agreement between the Trustee and the Oregon

24

25      [3] As with all references to orders and pleadings entered in this case or any other case, the
26   discussion in this Disclosure Statement is a summary and parties are referred to the documents
     for their complete terms.

1    Department of Agriculture, discussed below; $7,250,000 was distributed to Rabo AgriFinance,

2    LLC, N.A., in partial satisfaction of its secured claims; $943,761.80 was held by the Trustee in a

3    blocked account ("Blocked Account"), subject to further orders of Court;  and the balance,

4    specifically $53,137,710.89, was distributed in partial satisfaction of the Boardman Allowed

5    Secured Claim.  As such, the currently unpaid amount of the Allowed Boardman Claims is

6    $9,862,289.11, and as discussed below as much as approximately $1,193,761.80 of LVF Sales

7    Proceeds may still be distributed to Boardman.  In accordance with the AP Order, the funds

8    remaining in the ODA Reserve upon conclusion of the Trustee's obligations under the ODA

9    Agreement will be shared in equal parts by Boardman and Rabo AgriFinance, LLC.  The LVF

10   Sales Proceeds held in the Blocked Account will be distributed to IRZ Construction, LLC

11   ("IRZ"), Sineco Construction, LLC ("Sineco") and/or Boardman, upon resolution of the

12   remaining lien disputes – IRZ asserts that it has a first lien against $329,661.50 of the LVF Sale

13   Proceeds, plus interest and counsel fees under Oregon law.  See discussion of *Sugarman v. IRZ*

14   *Consulting, LLC*, below.  Sineco asserts that it is entitled to $142,219.40 of LVF Sale Proceeds,

15   plus interest and counsel fees under Oregon law.

16        The sale of the Lost Valley Farm did not eliminate the Estate's potential environmental

17   liabilities under the CAFO, which are liabilities personal to the Debtor (and the Estate as his

18   successor) and do not run with the land.  The Estate remains liable to the ODA to complete the

19   cleanup pursuant to the terms of an "Order and Mutual Agreement" ("OMA") executed by the

20   ODA and the Trustee and duly authorized by the Bankruptcy Court pursuant to FRBP 9019.  The

21   Trustee made arrangements with the Buyer for post-closing non-exclusive possession of the

22   property in order to comply with the OMA, and some of that compliance work dovetails with the

23   Buyer's own plans for the property (e.g., clearing the remaining commercial trees and installing

24   additional irrigation pivots). Much work has been completed.  The formidable task of disposing

25   all of the solid and liquid dairy waste remains.  When the Trustee took over, there were tons of

26   solid waste and over 40 Million gallons of liquid dairy waste which had to  be "land applied"

through pivot irrigation at regulated rates.  The Trustee has already disposed of approximately two thirds of the waste in compliance with the OMA.  After consultation with his environmental experts, the Trustee has budgeted another $2.3 Million to complete this clean up (including a 30% contingency cushion).  This budget is attached to this Disclosure Statement and labeled Exhibit 2.

The Trustee recognizes that this is a sizable sum, but believes it represents a small fraction of the Estate's potential administrative liability to the State of Oregon under the rule of *Midatlantic Nat. Bank v. New Jersey Dept. of Environmental Protection*, 474 U.S. 494, 106 S.Ct. 755 (1986) and *In re Smith-Douglass, Inc.*, 856 F.2d 12 (4th Cir. 1988) , if the Trustee were to simply abandon the property.

Another potential liability arising out of the Lost Valley Farm is the Trustee's dispute with Soleseco, LLC.  Prior to the filing of the Chapter 11 case, Soleseco and the Debtor executed a contract entitled "Soleseco Concrete Agreement", as amended.  Under this Agreement, Soleseco  paid the Debtor the sum of approximately $950,000 in two payments  for the construction of a 6 +/- acre concrete slab on the Lost Valley Farm.  In exchange for this payment, Soleseco was granted the right to use the slab for several months of the year,  through 2026, to air-dry tons of vegetable material for later sale to pet food processors.  Soleseco was using the slab when the Trustee was appointed.

In November, 2018, the Trustee barred Soleseco from further use of the slab.  The Trustee contends that the Soleseco Concrete Agreement was voidable, because it was conditioned on the express written consent of Boardman, and this was never obtained.  More importantly, the vegetable drying activity generated a large amount of waste water, and the ODA contended that this was in violation of the permits for the Lost Valley Farm.  The OMA directs the Trustee to terminate this activity.  On December 31, 2018, the Trustee filed an action against Soleseco entitled *Sugarman v. Soleseco*, LLC, A.P. No. 18-1088 seeking to declare the agreement void. Soleseco counterclaimed for allowance of an administrative claim in the amount of $8,000,000

1  for its anticipated lost profits and the costs incurred in constructing the concrete slab. Soleseco

2  contends that the Trustee's arguments that the contract is or was void because it is an illegal

3  contract, Boardman did not provide consent, or because of the doctrine of mutual mistake are

4  unsupported by firmly established Oregon law. Substantial discovery, including several

5  depositions, have been concluded. The Trustee and Soleseco have agreed to JAMS mediation of

6  the dispute in August, 2019. If the matter cannot be settled, it is likely to be tried in late 2019 or

7  early 2020.

8     There are complex disputes of law and fact in this matter, and it remains vigorously

9  disputed. There is a broad range of potential outcomes, including a complete vindication of the

10 Trustee's position, an allowed administrative claim in favor of Soleseco of $8,000,000, some

11 lesser allowed administrative claim, or some allowed general unsecured claim.

12                    **THE G.J. TE VELDE DAIRY**

13    The G.J. te Velde Dairy consists of approximately 1991 acres near Tipton, California. It

14 contains the Debtor's residence. The G.J. te Velde Dairy is a Holstein dairy, which has struggled

15 to achieve profitability before and after the Petition Date. The G.J. te Velde Dairy is a Holstein

16 cow dairy, and Holstein dairies have been under financial stress for some time. It appears that

17 the Debtor concentrated his energies on breeding at the GJT Dairy and built up a large herd. As

18 of the Petition Date, he had approximately 11,000 head of livestock on the site, approximately

19 half of which were productive milking cows and the balance were calves and heifers. The

20 milking herd had poor productivity, and the feed and maintenance cost was outsized in relation to

21 the income. After conferring with new management and consultants, the Trustee concluded that

22 the economics of the GJT Dairy could be improved by reducing the herd size by half, performing

23 capital improvements on the facility to increase production, and changing the feed mix. These

24 measures resulted in improved performance for the GJT Dairy, as is shown on the attached

25 Exhibit 3. The Trustee sold half of the GJT herd at public auction, with Court approval, and used

26 the proceeds to pay down the blanket secured credit line held by Rabo AgriFinance, LLC.

1     Like virtually all large dairies in the Central Valley, the GJT Dairy has a methane

2 digester, which captures the gas from large lagoons containing the dairy waste, processes it, and

3 allows it to be sold as a natural-gas like alternative energy source.  In addition to providing free

4 power to the GJT Dairy, this process generates outside income from the sale of these "carbon

5 credits".  It is also a requirement to maintain air quality in the area imposed by the San Joaquin

6 Valley Unified Air Pollution Control District.

7     When the Trustee took over operations, the methane digester had fallen into disuse.  With

8 a modest expenditure, the Trustee arranged for it to be put back on line, and it is now generating

9 all the power necessary to operate the dairy, a savings of approximately $300,000 per year.

10 Further, it is generating net income from the sale of "carbon credits" which are expected to

11 amount to at least $350,000 per year and possibly more.

12     Dairies are extremely high water users.  The Trustee learned that as a result of major

13 legislation known as "SGMA" [the Sustainable Groundwater Management Act], there may be

14 significant reductions in the water available to the GJT Dairy starting in 2020.  After consultation

15 with his management and other consultants, the Trustee concluded that this may be the best time

16 in a number of years to sell the GJT Dairy, and he listed it for sale.  After considerable effort, the

17 Trustee received an acceptable an offer from Maricopa Orchards, LLC,  a highly qualified buyer,

18 for the land and certain equipment (the methane digester assembly) in the amount of

19 $28,750,000,  with a prospective closing date of January, 2020.   The executed asset purchase

20 agreement is attached as Exhibit 2 to the Plan of Reorganization.  The Trustee is currently

21 seeking approval of that sale on a dual track basis: (1) a noticed motion pursuant to  Bankruptcy

22 Code Section 363(f), which is currently set for hearing on August 28, 2019; and (2) through this

23 Plan pursuant to Bankruptcy Code Section 1123(a)(5)(D).   The methane digester assembly is

24 subject to an unperfected purchase money financing lease in favor of Martin Leasing Resource,

25 LLC in the original amount of approximately $850,000, with a current balance of $150,000. The

26 Trustee intends to avoid this lien pursuant to Bankruptcy Code Section 544(a)(1) and (a)(2), and

1    has recently filed an adversary proceeding seeking this an other relief, *Sugarman v. Martin*

2    *Leasing Resource, LLC*, A.P. No. 19-01091.  The Trustee contends that pursuant to Bankruptcy

3    Code Section 551, the amount of the current balance of the Martin Leasing Resource, LLC lien

4    will be made available for unsecured creditors.

5         The Plan is premised in part on the sale to Maricopa Orchards, LLC being consummated

6    as scheduled and set forth in Exhibit 2 to the Plan.

7         The executed asset purchase agreement also gives Maricopa Orchards, LLC the option to

8    purchase the livestock and movable farming equipment other than the methane digester assembly

9    at a price to be fixed by appraisal formula.  The Trustee will not know until October 10 whether

10   Maricopa Orchards, LLC will choose to exercise that option.  If it does, Rabo AgriFinance, LLC

11   will receive most of those proceeds to pay down its "Herd & Feed Loan" described in footnote 2

12   above.

13        The Trustee believes that the sale of the GJT Dairy land and methane digester  at

14   $28,750,000 will net approximately $27,250,000 after payment of closing costs, a reduced

15   commission, and the amounts due the County of Tulare and Lower Tule River Irrigation District.

16   The final distribution and allocation of this $27,250,000 is subject to a number of complex

17   accounting and legal disputes between the Trustee and Rabo AgriFinance, LLC including (1) the

18   proper apportionment of the purchase price as between the land and the methane digester

19   assembly, since proceeds from the land go to bay Rabo AgriFinance, LLC's first and second deed

20   of trust on the real property, but the proceeds of the methane digester assembly and any other

21   personal property included in the sale go to pay Rabo AgriFinance, LLC's "Herd & Feed Loan";

22   (2) the proper allocation of "adequate protection payments" made to Rabo AgriFinance, LLC by

23   the Debtor and the Trustee since the Petition Date as between the real property and "Herd & Feed

24   Loan"; and (3) Rabo AgriFinance, LLC's entitlement to certain default-rate interest charges and

25   other fees under California law.  These issues are raised in the *Sugarman v. Martin Leasing*

26   *Resource, LLC* adversary proceeding noted above.   Further details are described at page 20

below in the section "The Estate Reserved Litigation". Notwithstanding these disputes, the Trustee concedes that Rabo AgriFinance, LLC should be paid a minimum of $26,000,000 from the proceeds of the sale to Maricopa Orchards, LLC, and the Plan so provides.

Rabo AgriFinance, LLC has filed a Motion for Relief from Stay seeking to foreclose one or both of its deeds of trust on the property and seize the entire value in the G.J. te Velde Dairy for itself. The hearing on that Motion is currently set for August 28. The Trustee and the Committee have opposed that relief. If the Motion for Relief from Stay is granted prior to the closing, this asset will be lost.

In previous settlement communications with Rabo AgriFinance, LLC, the Trustee informed Rabo AgriFinance, LLC that due to his fiduciary duties to unsecured creditors, the Trustee would refuse to voluntarily sell the G.J. te Velde Dairy unless there was a guarantied return to junior classes of creditors. That settlement position has been superseded. The Trustee is committed to sell the G.J. te Velde Dairy to Maricopa Orchards, LLC for $28,750,000, or overbid, subject to Court approval and the Buyer's performance. The Trustee is confident enough in his ability to reduce the Rabo AgriFinance, LLC Secured Claim on the G.J. te Velde Dairy to an amount which will generate a meaningful return to junior classes of creditors that he believes it is appropriate to accept the risk that he will be proven wrong and Rabo AgriFinance, LLC's Secured Claim will consume all of the net sales proceeds, as Rabo AgriFinance, LLC contends should be the case.

The Trustee believes that he can operate the GJT Dairy profitably through the closing. As was the case with the Lost Valley Farm, shortly before the closing the Trustee expects to liquidate the remaining dairy herd and equipment not included in the sale. The GJT Dairy livestock, feed, and most of its equipment are subject to the UCC-1 Financing Lien of Rabo AgriFinance, LLC. As noted above, all of the proceeds from the sale of this personalty will be paid over to Rabo AgriFinance, LLC.

### THE PACIFIC RIM DAIRY

The Pacific Rim Dairy consists of approximately 2700 acres near Corcoran, CA.  It currently has approximately 11,000 milk and dry cows plus approximately 11,500 support stock, plus various farming equipment.  The Pacific Rim Dairy has traditionally performed better than the G.J. te Velde Dairy for a number of reasons.  First, it is a Jersey cow dairy, rather than a Holstein cow dairy.  Jersey cows require less feed and generate higher quality milk.  Second, it has a better infrastructure than the G.J. te Velde Dairy.  Third, it has significantly less leverage on its real estate than the G.J. te Velde Dairy, both in absolute numbers and on a loan-to-value basis.

The principal economic flaw of the Pacific Rim Dairy at the time of the Trustee's appointment was that it lacked a functioning methane digester.  Prior to the Petition Date, a portion of the PRD land was acquired by the State of California for $13 Million for its well known high speed rail project.  The land taken by the State went right through the existing digester system on the PRD.  Rather than rebuild it with the sale proceeds, the Debtor spent the $13 Million elsewhere.

In his original Schedules of Assets and Liabilities, the Debtor valued the PRD land, equipment, livestock, and feed  at approximately $67,000,000.  The Trustee believes that the current fair market value of these assets is considerably less.  After conferring with his consultants and management, the Trustee believes that the best value for PRD will be obtained through its sale as a going-concern-dairy.  The Trustee has  listed the PRD for $56,000,000, and will rely on the market to fix the true value of this asset through a sale.

After conferring with all major creditor constituencies, the Trustee has determined that it is in the best interests of the Estate to sell the Pacific Rim Dairy as expeditiously as possible, provided that a reasonable price can be realized, and that is what the Trustee is diligently seeking to do.  Nonetheless, the California dairy sector is experiencing a dramatic drop and volatility in land values, livestock values, and milk prices, so that it is extremely difficult to predict when and

if the Trustee will receive a reasonable offer.[4]  For that reason, the Plan enables the Trustee to hold the Pacific Rim Dairy for up to three years as a back up option, assuming the asset cash flows. Under the Liquidating Trust Agreement governing the Trustee after Confirmation, the Trustee's discretion on whether to accept or reject a given offer for the Pacific Rim Dairy will be subject to the review of major creditors.  This should preclude any unnecessary delay.

The Trustee has been advised by his broker that in order to obtain the optimum price for the PRD, it will be essential to rebuild the methane digester, both from an environmental compliance standpoint but also to be able to generate additional cash flow from the sale of alternative energy credits, perhaps as much as $1.8 Million a year.  On July 30, 2019, after a duly noticed hearing, the Court authorized the Trustee to enter into a Lease and Manure Supply Agreement with an alternative energy company named Calgren, Dkt. No. 2370.  Under the terms of this Agreement Calgren will complete this project in at no cost to the Estate in consideration for the first share of revenues once the project is operational.  Creditors interested in the details of this transaction can review the documentation contained at Dkt. Nos. 2208-2211 of the Court's PACER docket system.

Additionally, as is the case for the GJT Dairy, the Trustee has instituted a number of managerial improvements on the PRD.  These measures resulted in improved performance for the PRD, as is shown on the attached Exhibit 4.

The PRD land is subject to a first deed of trust in favor of Golden State Farm Credit and a second deed of trust in favor of J.D. Heiskell Holdings, LLC in the combined amounts of approximately $15,000,000.  The PRD livestock, feed, and most of its equipment are subject to the UCC-1 Financing Lien of Rabo AgriFinance, LLC.  If the Trustee receives a purchase offer for the PRD which does not apportion the price between the land and the personalty, it may be

---

[4]  The Trustee believes that the buyer for the GJT Dairy intends to use the land for commercial orchard farming, not a dairy.  The Trustee has been advised that the PRD land and water rights under SGMA make it impractical to market to a commercial orchard, and that a dairy is the highest and best use of the property.

1  necessary to litigate a declaratory relief action with Rabo AgriFinance, LLC as to the correct

2  apportionment.  However, at this point in time, the Trustee estimates that the sale of the Pacific

3  Rim Dairy will generate  $7,000,000 - $10,000,000  for unsecured creditors.

4                              **"Cash Collateral"**

5            In addition to the physical components of the dairies, the Trustee generally holds

6  $3,000,000 - $5,000,000 in operating cash at any one time.  These funds represent the proceeds

7  of milk sales by the dairies and the proceeds from the sale of certain assets not subject to the

8  security interests of the Debtor's secured creditors.  Rabo AgriFinance, LLC and J.D. Heiskell

9  Holdings, LLC contend that these monies are their "cash collateral", as the term is defined by

10  Bankruptcy Code Section 363(a),  and must be paid over to them in order of their priority on

11  Confirmation of the Plan, or some other time.  Rabo AgriFinance, LLC further contends that,

12  even if these funds and other assets of the Estate were not originally its collateral or "cash

13  collateral", it has a "super-priority replacement lien" on these assets for the alleged diminution

14  value of its collateral from the Petition Date forward.  The Trustee does not know the precise

15  amount of the replacement lien claimed by Rabo AgriFinance, LLC, but he believes it is in the

16  millions of dollars.

17            Again, Rabo AgriFinance, LLC's contentions are disputed by the Trustee.  The Trustee

18  contends that there has been no actual diminution in value of Rabo AgriFinance, LLC's collateral

19  since the Petition Date.  To the contrary, the Trustee contends that the net value of Rabo

20  AgriFinance, LLC's collateral base has been enhanced since the Petition Date and that the Estate

21  may have a claim for a surcharge pursuant to Bankruptcy Code Setion 506(c).  The Trustee

22  further disputes that the contention that all of the cash on hand represents the proceeds of Rabo

23  AgriFinance, LLC's collateral base, and further disputes that he is obligated to pay over the cash

24  on hand to Rabo AgriFinance, LLC at confirmation.  Further litigation on these issues will be

25  required.

26

**OTHER ASSETS OF THE ESTATE**

In addition to the three dairies and the related "cash collateral", the Trustee is administering three other assets of the Debtor.

First, as of the Petition Date, the Debtor had a small fractional interest in three real estate limited partnerships established by his parents. The Trustee has executed a purchase agreement to sell those interests back to the family for $1,100,000, subject to overbid, and has filed a Motion seeking approval of that transaction which is currently set for hearing on August 14, 2019. approved and closed by the time of Confirmation. There will be a dispute over the disposition of these funds. Rabo AgriFinance, LLC contends that these limited partnership interests are included within its collateral. The Trustee disputes this contention. The Trustee contends that the terms of the underlying partnership agreements rendered any attempt by the Debtor to voluntarily borrow against these interests void. The Trustee further contends that these partnership interests were never described as collateral for the Rabo AgriFinance, LLC loans, and that the item "investment property" referenced in Section 1.01(a) of Rabo AgriFinance, LLC's "Amended and Restated Security Agreement", dated 12/8/14 does not include limited partnership interests pursuant to the provisions of Sections 9102(49), 8103(c), and 8102(a)(15) of the Uniform Commercial Code. The Trustee further contends that the sole means for a secured creditor such as Rabo AgriFinance, LLC to obtain a perfected security interest in a limited partnership interest is through a "charging order" issued pursuant to the provisions of California Corporations Code Section 15907.03. Rabo AgriFinance, LLC disputes all of these contentions. Further litigation will be required on this issue, and these claims are incorporated into the *Sugarman v. Martin Leasing Resource, et al* adversary proceeding.

Second, the Debtor owned a Cessna P210N airplane. The Trustee recently sold that airplane subject to Court approval and the Estate netted approximately $140,000.

Third, the Debtor owned two restored classic automobiles – a 1958 Cadillac Sedan de Ville and a 1966 Lincoln convertible. The Trustee placed these cars for auction and they

1    recently sold for a gross price of $25,550.00.

2        As part of his duties, the Trustee is continuing to investigate the possibility of additional

3    assets available for creditors.  If such assets are located they will likewise be sold for the benefit

4    of Creditors.

5                          **THE "ESTATE RESERVED LITIGATION"**

6        The term "Estate Reserved Litigation" appears throughout this Disclosure Statement and

7    the Plan.   The "Estate Reserved Litigation" is defined in the Plan to include <u>any</u> cause of action

8    held by the Debtor or the Trustee under either the Bankruptcy Code or non-bankruptcy law.  As a

9    practical matter, there are three filed or anticipated litigation claims known to the Chapter 11

10   Trustee as of this time.  Others may be discovered, and the Plan does not limit the Trustee to the

11   claims described below.

12       The first is the pending action *Sugarman v. IRZ Consulting, LLC*,  A.P. No. 19-01033.

13   This is an action for breach of contract and negligence against the project manager on the

14   construction of the Lost Valley Farm, who the Trustee contends is liable for the serious

15   environmental problems and resulting loss of value created by the defective design and

16   construction.  The Trustee seeks damages of approximately $20,000,000.  This litigation is in its

17   early stages, and may take years to resolve. Defendant IRZ vigorously disputes liability and has

18   advised the Trustee that it will seek to recover its attorneys fees against the Estate, which could

19   be well into the six figures.   Defendant IRZ further contends that any fees it might be entitled to

20   recover which exceed the amounts reserved for it  in the Blocked Account will be entitled to

21   administrative priority treatment.   Of course, given the state of construction of the Lost Valley

22   Farm, the Trustee denies that Defendant IRZ will recover anything.

23       The second is a potential claim against the Debtor's ex wife Janna Crawford to avoid a

24   constructive fraudulent transfer.  On February 19, 2013, the Debtor executed an Agricultural

25   Lease for 635 acres of land near the G.J. te Velde Dairy for $202,500 per year.  The lease

26   contained an option to purchase the property for $6,000,000.  Shortly before April 25, 2017, the

Debtor assigned this option to his ex wife.  She proceeded to purchase the property for $6,000.000.   At the time she purchased the property, it was worth almost $11,000,000.  The Trustee believes that the Estate may have a claim pursuant to Bankruptcy Code Sections 548 and 550 to either recover the property itself or $5,000,000 in damages representing the difference between the fair market value and the option strike price.  Ms. Crawford vigorously disputes the Trustee's theories.

Third, certain secured creditors of the Debtor, most notably Rabo AgriFinance, LLC, are asserting onerous "default rate" interest on their respective loans.  The Trustee contends that it is unlawful for an undersecured creditor to claim any interest, late charges,  and certain attorneys fees under Bankruptcy Code Section 506(b), and that "default rate" interest and the $665,000 "swap termination fee" charged by Rabo AgriFinance, LLC are void penalties under non-bankruptcy law to the extent it has no relationship to the creditor's cost of enforcement.  Rabo AgriFinance, LLC asserts that its recovery of "default rate" interest and other such charges are allowable as a matter of bankruptcy law under the rules of *General Electric Capital Corp. v. Future Media Productions, Inc*., 547 F.3d 956 (9th Cir. 2008), *In re New Investments, Inc*., 840 F.3d 1137 (9th Cir. 2016) and as a matter of nonbankruptcy law under the 1894 case of *Thompson v. Gorner*, 104 Cal.168.  The Trustee disagrees with Rabo AgriFinance, LLC, and relies on authority such as *Ridgely v. Topa Thrift & Loan Assn.*, 17 Cal.4th 970 (1988), *Greentree Fin. Grp. v. Execute Sports*, 163 Cal.App.4th 495, 500 (2008), and *In re Aero Drive Holdings, LLC*, 2017 WL 2712961 (Bankr. S.D. Cal. 2017). Further litigation will be necessary on these issues, and these claims are also incorporated into the *Sugarman v. Martin Leasing Resource, LLC, et al* adversary proceeding.

To reiterate, the preceding list is in no way a limitation; under the Plan the  Liquidating Trustee  retains the power to investigate and litigate *any* claims held by the Estate against *any* party.  If the Liquidating Trustee concludes that such claims are meritorious, the Plan reserves his right to prosecute such claims as "Estate Reserved Litigation."

1    Creditors should be aware that any litigation recovery is time-consuming, expensive,

2    speculative and uncertain.  Any target of litigation claims is expected to vigorously dispute

3    liability.  It is a distinct possibility that the Estate could recover nothing from the Estate Reserved

4    Litigation.  It is also a possibility that the Estate could be worse off if the Estate Reserved

5    Litigation is unsuccessful, due to litigation costs and the possibility that the adverse parties could

6    recover their attorneys fees.  An estimate of the potential cost, upside benefits, and downside

7    risks of this litigation is attached as Exhibit 11.  To give Creditors some control over ongoing

8    litigation costs, the Plan gives the Creditors' Committee a post-confirmation role in the decision

9    to accept or reject any settlement proposal from an adverse party.

10                **III SUMMARY OF THE CHAPTER 11 TRUSTEE'S PLAN**

11    The Chapter 11 Trustee's Plan of Reorganization is what is known as a liquidating plan

12    of reorganization.  A "Liquidating Trust" will be created and the Chapter 11 Trustee, or such

13    person as is appointed by the Court will serve as "Liquidating Trustee".  The Liquidating Trustee

14    will attempt to expeditiously sell the GJ te Velde Dairy and the Pacific Rim Dairy.  The Plan

15    provides for the restructuring of the secured debt on those assets pending closing of those sales.

16    The Plan also provides a back-up option in the event a sale for either dairy is not consummated

17    by allowing the Liquidating Trustee to operate the facilities for up to three years,  or until market

18    conditions improve.

19    The current members of the Official Committee of Unsecured Creditors will serve as a

20    "Liquidating Trust Advisory Committee" to assist the Liquidating Trustee in managing the

21    tangible assets of the Estate and managing the Estate Reserved Litigation.  The Office of the U.S.

22    Trustee will have no further oversight responsibility in the operation of the Liquidating Trust.

23    Unsecured creditors will be paid in periodic installments from unencumbered cash as it

24    accumulates.  As is laid out in greater detail below, due to numerous pending uncertainties, there

25    is a large range of the percentage dividend payable to unsecured creditors – between 18%  and

26    100%.  Since the high end of this is dependent upon the outcome of complex litigation, the

1    Trustee believes that the final payout will not occur before 3 - 5 years from the Effective Date.

2        Treatment of the Secured Claims described below is also complex.  Although every

3    Creditor holding a nominally Secured Claim is separately classified, under Bankruptcy Code

4    Section 506(a)(1) a Creditor is entitled to treatment as a Secured Creditor only to the extent that

5    there is equity in its collateral to attach to its lien.  Thus, for example, if a Secured Creditor is

6    junior in priority to other Secured Creditors whose liens consume the entire equity in the

7    collateral, that Creditor will be adjudicated as unsecured and treated the same as other Unsecured

8    Creditors.  Similarly, if a Creditor has an "undersecured lien", Section 506(a)(1) operates to

9    bifurcate that Creditor's Claim into secured and unsecured portions.   Before Section 506(a)(1)

10    can be applied to a particular Secured Claim, there must be either (a) voluntary agreement by the

11    Creditor in question or (b) a separate proceeding commenced by the Trustee to "strip" the lien.

12    The Chapter 11 Trustee has already commenced "lien-stripping" litigation against certain

13    undersecured Secured Creditors described below, though he hopes these matters can be resolved

14    consensually. [5]

15        After all of the required Plan Distributions have been consummated, the Liquidating

16    Trust will terminated.

17        The treatment of claims and interests described below applies only to Allowed Claims.

18    Determination of the amounts due to Creditors will be  made after reconciliation of the amounts

19    claimed by the Creditor in question with the Debtor's business records, and the resolution of the

20    above-described litigation.  In the event of a dispute, the Liquidating Trustee will file objections

21    to the allowance of the claim in question.

22        The treatment of each particular type of Creditor is described below.

23              **CLASSIFIED CLAIMS AND INTERESTS**

24

25       [5]  In certain situations secured creditors may avoid some consequences of "lien stripping" through something called a "Section 1111(b) Election."  If a secured creditor makes a timely

26    "Section 1111(b) Election", the Chapter 11 Trustee may be required to make an appropriate modification to this Plan prior to Confirmation.

1    The Plan divides Claims into 13 classes.  A description of each class and its treatment

2  under the Plan follows.

3    Class 1a:          Secured Claim of The County of Tulare

4    The County of Tulare  holds a Secured Claim for back,  unpaid real estate taxes  in the

5  approximate amount of $130,000 secured by the G.J. te Velde Dairy.   The Plan provides that any

6  such defaulted real property taxes will be repaid with interest as required by Bankruptcy Code

7  Section 511 in semi-annual installments paid over five years from the Petition Date, commencing

8  on the Effective Date.  This Class is impaired and entitled to vote on the Plan.  The Trustee

9  believes this Claim is fully secured.

10    Class 1b:          Secured Claim of The County of Tulare

11    The County of Tulare  holds a second Secured Claim for back, unpaid real estate taxes  in

12  the approximate amount of $145,000 secured by the Pacific Rim Dairy.   The Plan provides that

13  any such defaulted real property taxes will be repaid with interest as required by Bankruptcy

14  Code Section 511 in semi-annual installments paid over five years from the Petition Date,

15  commencing on the Effective Date.  This Class is impaired and entitled to vote on the Plan.  The

16  Trustee believes this Claim is fully secured.

17    Class 2a:          Secured Claim of The Lower Tule Irrigation District.

18    The Lower Tule Irrigation District  holds a Secured Claim for back, unpaid irrigation fees

19  in the approximate amount of $202,000 secured by the G.J. te Velde Dairy.   The Plan provides

20  that any such defaulted irrigation fees will be repaid with interest at 4% per annum in semi-

21  annual installments paid over five years from the Petition Date, commencing on the Effective

22  Date.  This Class is impaired and entitled to vote on the Plan.  The Trustee believes this Claim is

23  full secured.

24    Class 2b:          Secured Claim of The Lower Tule Irrigation District.

25    The Lower Tule Irrigation District  holds a second Secured Claim for back,  unpaid

26  irrigation fees in the approximate amount of $200,000 secured by the Pacific Rim Dairy.   The

Plan provides that any such defaulted irrigation fees will be repaid with interest at 4% per annum in semi-annual installments paid over five years from the Petition Date, commencing on the Effective Date. This Class is impaired and entitled to vote on the Plan.

The Trustee believes this Claim is fully secured.

Class 3:          Secured Claim of Golden State Farm Credit

Golden State Farm Credit, holds a Secured Claim in the approximate amount of $6,000,000 (the precise amount is subject to dispute) collateralized by a first deed of trust on the Pacific Rim Dairy. The Plan provides that Golden State Farm Credit will be given a new promissory note secured by its existing lien. The Modified Note will bear interest at the non-default contract rate of its existing obligation as of the Petition Date, payable in monthly installments of principal and interest amortized over 40 years, but due in full in three years.[6] If the Liquidating Trust defaults on its post-confirmation obligation, the Class 3 Creditor will be permitted to foreclose. This Class is impaired and entitled to vote on the Plan. The Trustee believes this Claim is fully secured.

Class 4a:          Secured Real Estate Claims of Rabo AgriFinance, LLC,

Rabo AgriFinance, LLC, holds two Secured Claims in the approximate aggregate amount of $24,870,264 as of May 1, 2019, (this figure is subject to vigorous dispute by Rabo AgriFinance, LLC[7]) collateralized by a deed of trust on the G.J. te Velde Dairy. The Plan

---

[6] The Trustee and other major creditor constituencies in the case has expressed the desire to sell the Pacific Rim Dairy as expeditiously as possible, but this asset is very illiquid. The four year term is a precautionary measure in the event that the Trustee cannot obtain a reasonable, acceptable price in the short term.

[7] The Trustee believes that Rabo AgriFinance, LLC contends that it is owed approximately $29 Million on these loan loans, because Rabo AgriFinance, LLC has been applying the millions of dollars it has received to date in this Case to default-rate interest, late charges, contract-rate interest, and attorneys fees and other charges on its "Herd and Feed Loan". The Trustee contends that this is an unlawful and inappropriate accounting, as is discussed in greater detail in the Estate Reserved Litigation section of this Disclosure Statement. This disputed contention will likely require further litigation to resolve.

1   provides that Rabo AgriFinance, LLC will be given a new promissory note consolidating both

2   secured by its existing lien.  The Modified Note will bear interest at the blended, non-default

3   contract rates of its existing obligations as of the Petition Date, payable in monthly installments

4   of principal and interest amortized over 40 years, but due in full in one year.[8]  If the Liquidating

5   Trust defaults on its post-confirmation obligation, the Class 4a Creditor will be permitted to

6   foreclose.  This Class is impaired and entitled to vote on the Plan.  The Trustee believes this

7   Claim is fully secured.

8            Class 4b:        Secured "Herd and Feed" Claim of Rabo AgriFinance, LLC,

9            Rabo AgriFinance, LLC,   holds a second Secured Claim in the approximate amount of

10   $27,000,000 (the precise amount is subject to dispute[9])  collateralized by a first position UCC-1

11   Financing Lien on all livestock, non-certificated furniture, fixtures, and equipment, and feed

12   associated with both the G.J. te Velde  Dairy and the Pacific Rim, as well as 50% of the funds in

13   the ODA Reserve.[10]  This claim has sometimes been referred to as "the Herd and Feed Loan".

14   The Plan provides that to the extent that this Claim is an  Allowed Secured Claim under

15   Bankruptcy Code Section 506(a)(1),  Rabo AgriFinance, LLC will be given a new promissory

16

17       [8]  This one year term is a precautionary measure in the event that the Trustee's pending
     sale of the G.J. te Velde Dairy falls through.  It is the Trustee's expectation the pending sale will

18   close and  that this loan will be paid in full by January 31, 2020.

19       [9]  The Trustee believes that Rabo AgriFinance, LLC contends that it is owed
     approximately $30 Million on this loan.  Again, the Trustee disputes  Rabo AgriFinance, LLC's

20   entitlement to default-rate interest, late charges, and other penalties.   The Trustee further
     contends that due to the under-secured status of its loan, Rabo AgriFinance, LLC has been

21   obligated to apply all post-petition payments it has received to principal under the rule of *In re
     Weinstein*, 227 BR 284 (9th Cir. BAP 1998).  Rabo AgriFinance, LLC, of course, disagrees.

22

23       [10]  As is discussed in detail above in the section "Other Assets of the Estate" Rabo
     AgriFinance, LLC also makes the disputed contention that this lien extends to the Debtor's

24   family limited partnership interests.  The Trustee disagrees and will litigate this dispute.  Rabo
     AgriFinance, LLC also contends that this lien is cross-collateralized on the G.J. te Velde Dairy

25   real estate.  The Trustee disagrees based on the Sections 4.01(a) and 4.04(a) of Rabo
     AgriFinance, LLC's "Amended and Restated Deed of Trust" recorded on 4/20/2016 as Document

26   No. 2016-0021318.   This dispute must also be litigated in the *Sugarman v. Martin Leasing
     Resource, LLC* adversary proceeding.

note secured by its existing lien.  The Modified Note will bear interest at the non-default contract

rate of its existing obligation as of the Petition Date, payable in monthly installments of  interest

only and due in full in three years, or as lots of the collateral in question are liquidated.  If the

Liquidating Trust defaults on its post-confirmation obligation, the Class 4b Creditor will be

permitted to foreclose.  This Class is impaired and entitled to vote on the Plan.  The Trustee

believes this Claim is secured in the approximate amount of $22,000,000, and unsecured for its

balance. Rabo AgriFinance, LLC contends that it is fully secured.

Class 5:          Secured Claim of J.D. Heiskell Holdings, LLC ("JDHH")

J.D. Heiskell Holdings, LLC  holds a Secured Claim in the agreed amount of

$9,109,975.41 as of July 31, 2019, plus interest and attorneys' fees and collection costs through

the Effective Date of the Plan, collateralized by  second  deeds of trust on the Pacific Rim Dairy

and G.J. te Velde Dairy and a second position UCC-1 Financing Lien on all livestock, non-

certificated furniture, fixtures, and equipment, and feed associated with both the G.J. te Velde

Dairy and the Pacific Rim.  JDHH's debt instruments bear interest a 9.5% per annum. After

carefully reviewing the loan balance of JDHH to ensure its accuracy and further reviewing the

loan documents to ensure that the Estate had no viable defenses to this debt, the Trustee entered

into an with JDHH to give it an agreed treatment under the Plan.

The Plan provides that to the extent that the Class 5 Creditor will be given a new

promissory note secured by its existing lien.  The Modified Note will bear interest at the rate of

seven percent (7%) per annum, payable in monthly installments of  interest only and due in full

in three years.  The Plan gives JDHH a comprehensive release of all state law and  "Chapter 5"

causes of action held by the Trustee which could theoretically be used to attack the amount or

priority of the claim.[11]  If the Liquidating Trust defaults on its post-confirmation obligation, the

---

[11]  The principal benefit to the Estate of this arrangement is the agreed post-confirmation
interest rate and the "interest only" payment terms.  Under the controlling authority of *Till v. SCS
Credit Corp.*, 541 U.S. 465, 124 S.Ct. 1951 (2004) *l* and its progeny, fixing "cram down" interest
is expensive and uncertain.  The Trustee believes that 7% per annum is a mid-range outcome.

Class 5 Creditor will be permitted to foreclose.  This Class is impaired and entitled to vote on the

Plan.  The Trustee believes although this Claim is completely unsecured as to its UCC-1

Financing Lien and its second deed of trust on the G.J. te Velde Dairy, it is fully secured by its

second deed of trust on the Pacific Rim Dairy.

Class 6:          Secured Claim of Overland Stockyards, Inc.

Overland Stockyards, Inc., holds a Claim in the approximate amount of $1,700,000

nominally collateralized by  a third position UCC-1 Financing Lien on all livestock, non-

certificated furniture, fixtures, and equipment, and feed associated with both the G.J. te Velde

Dairy and the Pacific Rim Dairy. The Trustee believes that this Claim is entirely unsecured and

will be treated as a General Unsecured Claim in Class 11. Nonetheless, to comply with the

technical provisions of the Bankruptcy Code, the Plan is required to set forth a proposed

treatment for the Class 6 Claim in the highly unlikely event that it is treated as a Secured Claim.

Thus, the Plan provides that to the extent the Class 6 Claim is treated as an Allowed Secured

Claim, the Class 6 Creditor will be given a new promissory note secured by its existing lien.  The

Modified Note will bear interest at the rate of four and one-half percent (4.50%) per annum,

payable in monthly installments of  interest only and due in full in five years.  If the Liquidating

Trust defaults on its post-confirmation obligation, the Class 6 Creditor will be permitted to

foreclose.  This Class is impaired and entitled to vote on the Plan.

Classes 7, 8, & 9:     Secured Claims Against Lost Valley Farm Proceeds.

Classes 7, 8, & 9 are held by Boardman Tree Farm, LLC, IRZ,  and Sineco,  respectively,

against the remaining LVF Sales Proceeds held in the Blocked Account and are asserted in the

amounts described above.  These LVF Sales Proceeds are subject to a priority dispute among

these three creditors.  IRZ and Sineco assert Oregon state law construction liens and claim that

they allege are senior in priority of payment to the Boardman Allowed Secured Claim.   If IRZ

---

Also, "interest only" payment generally requires secured creditor consent.

and Sineco are correct and their underlying claims are valid, they will be paid from the remaining LVF Sales Proceeds, and any remaining funds in the Blocked Account will go to Boadman to partially satisfy the Allowed Boardman Secured Claim. The balance of the Boardman Secured Claim is an Allowed unsecured deficiency claim and classified and treated as a Class 11 General Unsecured Claim. If Boardman is correct that its deed of trust is senior in priority to the IRZ and Sineco claims, it will receive the entire amount in the Blocked Account. Again, the balance of Boardman's Allowed Secured Claim is an Allowed Deficiency claim treated as a Class 11 General Unsecured Claim. The ultimate amount of the Boardman Allowed Deficiency Claim will be approximately $7,668,427.31 - $8,862,189.11, dependent on the amount Boardman receives from the funds in the ODA Reserve and Blocked Account.[12]   The Trustee contends that Sineco is barred from treatment as a Class 11 General Unsecured Creditor, since it wilfully failed to file a timely Proof of Claim, seemingly in an effort to escape jurisdiction of the Bankruptcy Court.

For avoidance of doubt, the Plan provides that the restrictions on the Blocked Account will be binding on the Liquidating Trustee after Confirmation.

The Trustee contends that to the extent that these claims are Allowed Secured Claims, they are unimpaired and not entitled to vote on the Plan. To the extent that these claims are Allowed Unsecured Claims, they are entitled to vote as Class 11 General Unsecured Creditors. The Class 7, 8, & 9 Creditors may or may not disagree with the contention.

Class 10:        Priority Claims for Wages and Employee Benefits.

Bankruptcy Code Section 507(a)(4) provides that unsecured claims for wages, salaries or commissions, including vacation, severance and sick leave pay earned within 180 days before the date of the filing of the Petition, in an amount not to exceed $12,850 for each individual, are

---

[12] Boardman has an additional Allowed Unsecured Claim, the Surrender Agreement Claim described above, in the amount of $1,000,000. This Claim is included in Class 11.

entitled to priority.   Bankruptcy Code Section 507(a)(5) provides a priority for unpaid

contributions to employee benefit plans arising from services rendered within 180 days before the

date of the filing of the Petition,, also with certain monetary limitations thereon.  The Plan

provides that these claims will be paid in full on the Effective Date.  The Trustee believes that

the allowable amount of these Claims totals $22,981.76.  This class is unimpaired and not

entitled to vote on the Plan.

        Class 11:        <u>Claims of General Unsecured Creditors</u> .

        General Unsecured Creditors  will be paid periodic annual dividends from the proceeds of

the liquidation of the assets of the Estate, after payment of all Allowed Unclassified Claims,

Allowed Priority Claims, and Allowed Secured Claims, all to the extent that these types of

claims were not paid prior to plan confirmation.  There are three sources for payment of Allowed

General Unsecured Claims, in order of certainty: (1) proceeds of sale from the Pacific Rim Dairy

in the approximate amount of $7,000,000 - $10,000,000 remaining after payment of all Secured

Claims collateralized by those assets; (2) proceeds of sale of unencumbered assets of the Debtor

in the approximate amount of $2,000,000; and (3) proceeds of the recovery from the Estate

Reserved Litigation, which could range between zero and $22,000,000.  Thus, the Trustee

estimates that the range of value of assets available for general unsecured creditors will be

between a low of $7,000,000 and a high of $39,000,000.

        IRZ, who the Trustee contends is the principal source of the massive economic losses to

creditors caused by the Lost Valley Farm environmental problems, claims  that there will not

even be $15,000,000 to pay to unsecured creditors, because it is confident that the quality of its

work will be completely vindicated in the *Sugarman v. IRZ Consulting, LLC* litigation.  IRZ

further contends that it will recover hundreds of thousands or even millions of dollars in

attorneys fees against the Estate.  The Trustee vehemently disagrees IRZ, but the Trustee believes

it is appropriate to set out competing contentions in this Disclosure Statement, no matter how

specious they are deemed to be by the Trustee, to enable creditors to draw their own conclusions.

1    The total amount of Allowable General Unsecured Claims is likewise uncertain at this

2    time and may require substantial additional litigation to fix. The Trustee believes that the

3    minimum amount of Allowable General Unsecured Claims is approximately $28,000,000.

4    However, this does not include two unliquidated employment law related tort claims in the filed

5    amount of $2,600,000, any unsecured deficiency claim for IRZ, or any unsecured deficiency

6    claim for Rabo AgriFinance, LLC which could be in excess of $6,000,000 (depending largely on

7    the fluctuating price of its livestock collateral). Thus, the Trustee estimates that the range of

8    liabilities represented by the unsecured creditors is between $28,000,000 and almost

9    $37,000,000.

10    This translates into an estimated dividend ranging between approximately 18% and

11    100%. In determining whether to accept or reject the Plan, Creditors should assume a recovery

12    on the low side of this range.

13    Allowed Unsecured Claims are entitled to payment of the full amount of their Allowed

14    Claims with interest at the Legal Rate, until the assets of the Liquidating Trust are exhausted.

15    Any surplus remaining will be paid over to the Debtor. This Class is impaired and entitled to

16    vote on the Plan.

17    Class 12:      <u>Administrative Convenience Claims</u>.

18    Bankruptcy Code Section 1122(b) provides that small claims may be separately classified

19    and paid to avoid the time and expense of calculating multiple small dividends. Class 12

20    consists of such Allowed Claims in the amount of $5,000, or less. The Plan provides that these

21    Claims will be paid in full on the Effective Date. The Trustee believes that the allowable amount

22    of these Claims totals approximately $8,000.00. This class is unimpaired and not entitled to vote

23    on the Plan.

24    Class 13:      <u>The Interest of the Debtor</u>

25    Class 13 is the Interest of the Debtor. The Plan provides that the Debtor will retain his

26    exempt property and any surplus of the Estate after all Allowed Claims and expenses are paid in

full.  The Trustee believes that it is  unlikely that there will be any surplus.  This class is

unimpaired and not entitled to vote on the Plan.

**UNCLASSIFIED CLAIMS**

          1.    <u>Administrative Claims</u>

Section 1123(a)(1) of the Bankruptcy Code provides that certain claims, including claims

for post-petition administrative expenses (including professional fees) and certain claims by

governmental units for taxes, are not classified under the Plan.   Entities holding unclassified

claims are not entitled to vote on the Plan.

Any unpaid professional fees incurred up through Confirmation will be paid if and when

allowed by the Court pursuant to Bankruptcy Code Section 330.  The Chapter 11 Trustee 's

counsel estimates that there will be accrued and  unpaid professional fees for all parties of

approximately $300,000 as of the Effective Date of the Plan, though this number could be greater

or lesser depending upon whether there is litigation over confirmation of the Plan.  All other

post-petition administrative expenses, including quarterly fees due or to become due to the

United States Trustee will be paid as of the Effective Date of the Plan.  All fees due to the United

States Trustee, though entitled to administrative priority, are statutory in nature and are exempt

from any requirement to file a request for payment of administrative expense.

There is a broad range of potential liability for unpaid non-tax administrative expenses,

other than professional fees.   The Chapter 11 Trustee believes that these unpaid non-tax

administrative expenses will be approximately  $300,000, consisting primarily of the Allowed

Administrative Expense Claims of Pascoe Farming and the Oregon Department of Agriculture.

There are two other potential administrative claims, or classes of administrative claims,

which are deemed uncertain or disputed by the Chapter 11 Trustee.  The Trustee believes that

these claims will not result in liability to the Estate, but the disputes have not been adjudicated as

of the date of this Disclosure Statement.

First, Bankruptcy Code Section 503(b)(9) grants administrative priority for "(9) the value

of any goods received by the debtor within 20 days before the date of commencement of a case

under this title in which the goods have been sold to the debtor in the ordinary course of such

debtor's business." The Debtor's original Schedule E filed on May 10, 2018, as Dkt No. 159

included a broad category, over "Priority Creditor's Name", "Section 503(b)(9) - 20 day Claims".

It then stated the amount to be $1,500,000, and described the claim as "Certain farmers and

fisherman. As of May 10, 2018 this list was being developed. Estimated amount of $1,500,000.

Amendment will be filed."    On July 11, 2018, the Debtor filed Amended Schedules, but no

further information was provided concerning any Section 503(b)(9) claims. An analysis of the

Claims Register reveals no significant claim of Section 503(b)(9) priority in any filed Proof of

Claim. The Trustee believes that the amount of Section 503(b)(9) claims estimated in the original

schedules was vastly overstated and that most such claims, to the extent they actually existed,

were duplicative of Oregon statutory Agricultural Service Liens, which were all satisfied in

connection with the liquidation of the Lost Valley Farm. However, to ensure that this liability is

fixed by the time of Confirmation, the Court has established a bar date for these Claims of

September 20, 2019. Any such claims not filed by that bar date will be disallowed.

Second,  there is a disputed $8,000,000 +/-  Administrative Expense Claim asserted by

Soleseco, LLC arising out of its construction and discontinued use of a 6 acre concrete pad on the

Lost Valley Farm, which is described in greater detail above. The Trustee disputes that the

Estate has any liability to Soleseco, and further contends that in the unlikely event that there is

such liability, the amount owing is not entitled to administrative priority treatment and it is far

less than $8,000,000.  Soleseco strongly disagrees with the Trustee's analysis. Soleseco believes

it holds an administrative claim greater than $8,000,000. Soleseco contends that it holds a

substantial administrative claim based upon the post-petition breach of the non-executory

contract among the Debtor and Soleseco which was in full force and effect through mid-

November 2018, when the Trustee denied Soleseco access and use of the concrete pad. Soleseco

further contends that the Trustee's legal arguments that the contract is void because it is an illegal

contract, Boardman did not provide consent, or because of the doctrine of mutual mistake are

unsupported by firmly established Oregon law and the facts. Soleseco believes that it is

imperative that its entitlement to an allowed administrative claim be resolved before the

Confirmation of the Plan, since the Trustee has admitted that the allowance of the Soleseco claim

as filed will render the Plan infeasible.

2.    <u>Pre-petition Tax Claims</u>

The plan provides that all pre-petition tax claims entitled to priority under Bankruptcy

Code Section 507(a)(8) will receive deferred cash payments over a period not to exceed five

years after the Petition Date, which is the minimum treatment required by Bankruptcy Code

Section 1129(a)(9)(C). Tax claims will bear interest at the rate specified in Section 6621 of the

Internal Revenue Code. The Chapter 11 Trustee believes that the Debtor owes priority unpaid

state and federal taxes of approximately $54,000.

**OTHER PROVISIONS OF THE CHAPTER 11 TRUSTEE'S PLAN**

The Chapter 11 Trustee's Plan contains a number of other provisions concerning its

implementation. The following is a summary. Consult the Chapter 11 Trustee's Plan itself for

details.

1.    <u>Post Confirmation Management</u>.

Following the Confirmation, the general role of the Liquidating Trustee will be to oversee

day-to-day operation of the dairies, arrange for their sale when appropriate, manage all Estate

Reserved Litigation and Contested Matters arising out of the Estate or the Plan, make required

Distributions under the Plan, and to close the Liquidating Trust when all assets are exhausted and

all final Distributions are made.

The Liquidating Trustee will be compensated on the statutory commission of a Chapter 7

Trustee as set forth in Bankruptcy Code Section 326(a); i.e., 3% of the amount of post-

confirmation disbursements to creditors. In an operating Chapter 11 case, this typically includes

monthly disbursements from operating revenues. Here, however, to ensure that the Trustee has

no incentive to delay a sale of the of Pacific Rim Dairy, the Plan provides that after January 31, 2020, no compensation shall be payable to the Trustee from operating revenues received and disbursed after that date.  Even with this limitation, this could result in a fee to the Liquidating Trustee of up to $1,500,000 depending upon the outcome of the Estate Reserved Litigation.

Pre-confirmation compensation of the Chapter 11 Trustee will be determined by the Court on duly noticed motion and hearing.

2.      Administrative Powers.

The Trustee's Plan confers broad administrative powers on the Liquidating Trustee. These include the power to prosecute all litigation claims belonging to the Estate or the Debtor. Consult the Plan for details.

3.      Post-Confirmation Compensation and Reimbursement of Professionals.

The Liquidating Trustee and his professionals shall be entitled to payment of their post-Confirmation fees and reimbursement of expenses without the necessity of Court approval.  Pre-confirmation compensation remains subject to the noticed motion requirements of Bankruptcy Code Section 330.

4.      Executory Contracts.

Bankruptcy Code Section 365 gives special consideration to "executory contracts", which are contracts requiring ongoing performance of both the Debtor and the other party to the contract.  The Chapter 11 Trustee's Plan provides that any such executory contract which exists is deemed accepted as of the Effective Date, except for executory contracts between the Debtor and any Insider, which are deemed rejected.  However the Chapter 11 Trustee's Plan further provides that this designation may be changed and that any executory contract may be assumed or rejected up through the time of Confirmation.  If there is a rejected executory contract is timely rejected by the Debtor, the holder of the contract right may have a "Rejection Claim" as defined in the Plan and subject to the deadlines and treatment specified therein.

There are fifteen agreements to the Chapter 11 Trustee which might be considered

1   "executory contracts" within the meaning of Bankruptcy Code Section 365.  Thirteen of those are

2   listed in the Debtor's Schedule G.   First, there is the office lease for the administrative office of

3   the California dairies, which has already been assumed by Court Order.  Second, there is the

4   Soleseco Contract Agreement, which the Trustee has sought to reject and is subject to the

5   litigation with Soleseco discussed above.  Third, there are three milk marketing agreements for

6   the California dairies with California Dairies, Inc., Dairy Farmers of America, and Leprino

7   Foods, which are to be assumed by the Plan.  Fourth, there is a purported Standby Letter of

8   Credit between the Debtor and Rabo AgriFinance, LLC, which the Trustee believes is a non-

9   assumable financial accommodation as defined by Bankruptcy Code Section 365(c)(2), Fifth

10  there is a real estate brokerage agreement with Schuil & Assoicates, which has been superseded

11  by employment orders in this Chapter 11 case.  Sixth, there is an "Oral Calf Raising Agreement"

12  with Frings Ranch, which has been terminated in connection with a stipulated Order granting

13  relief from stay entered on November 14, 2018.  Seventh, there is a "Capital Equipment Lease"

14  with Martin Leasing Resources, LLC, for certain equipment on the GJT Dairy, which the Trustee

15  contends is not an "executory contract", but is instead a security agreement subject to Articles 9

16  and 10 of the Uniform Commercial Code.   Finally, the balance of the agreements in question

17  have been terminated and/or assumed and assigned in connection with the Trustee's sale of the

18  Lost Valley Farm.

19        Although the Plan makes reference to the possibility of executory contracts with

20  "Insiders", this is precautionary.  No such contracts are known to exist by the Trustee.

21              5.      Distributions and Claims.

22        Subject to the deadlines in the Plan, distributions will be made to a given Creditor when

23  its Claims are Allowed Claims, as defined in the Plan.  Proofs of Claim, when required, must be

24  filed with the Bankruptcy Court no later than the applicable Claims Bar Date (which for most

25  prepetition Claims was September 4, 2018) or the applicable Governmental Unit Claims Bar

26  Date for prepetition tax and similar Claims (November 3, 2018).  However, Bankruptcy Rule

1    3001(b) provides that it is not necessary for a Creditor to file a proof of Claim if its Claim has

2    been listed on the Debtor's Schedules filed with the Bankruptcy Court pursuant to Section

3    521(a)(1) of the Bankruptcy Code and Rule 1007(a)(3) of the Bankruptcy Rules, and is not listed

4    as disputed, contingent, unliquidated or unknown as to amount.   Except as provided by the Plan

5    or as otherwise permitted by the Bankruptcy Court, the Bankruptcy Rules or applicable law, upon

6    expiration of the applicable bar date, proofs of Claim may not be filed or amended unless the

7    amendment is solely to decrease the amount or priority.  Distributions to Creditors under the Plan

8    will be made to the Persons shown on the Debtor's Schedules or the Bankruptcy Court's records

9    on the Effective Date, unless Creditors file an appropriate change of address or assignment of

10    claim with the Bankruptcy Court.

11        Objections to any Claim may be filed by any party in interest and shall be filed no later

12    than the Claims Objection Bar Date, which is defined in the Plan as 180 days after the Effective

13    Date.

14            6.    <u>Reservation of Litigation Rights.</u>

15        Under the Plan, except to the extent the Plan specifically provides to the contrary, the

16    Estate is reserving all litigation rights and defenses against all Creditors and any third party,

17    including without limitation (1) any claims and causes of action  under the Bankruptcy

18    "avoidance statutes" and all other claims which are vested in the Estate pursuant to Bankruptcy

19    Code Sections 502, 506, 510, 542, 542, 543, 544, 545, 547, 548, 549, 550, and 553, (the "Estate

20    Reserved Litigation") and (2) the right to object to any Claim, even if the Creditor in question

21    votes to accept the Plan.  All litigation claims owned by the Estate or the Debtor will be pursued

22    exclusively by the Trustee.  The failure of this Disclosure Statement to disclose or discuss any

23    particular potential Claim objection, cause of action or claim for relief held by the Debtor or the

24    Estate is not and shall not be construed as a settlement, compromise, waiver, or release of any

25    such Claim objection, cause of action or claim for relief.  **The Claim of any Creditor is subject**

26    **to objection by a party in interest  and disallowance by the Court, even if that Creditor**

1   **votes in favor of the Plan.**

2          7.      Retention of Jurisdiction.

3          The Plan provides that the Bankruptcy Court shall retain broad jurisdiction under the

4   Bankruptcy Code to adjudicate any disputes arising out of the Plan, the administration of the

5   Cases, and claims for relief held by theTrustee .

6          8.      Persons Bound/Discharge.

7          Confirmation of the Plan binds the Debtor, any entity acquiring property under or

8   otherwise accepting the benefits of the Plan, and every Creditor, whether or not such Creditor has

9   filed a proof of Claim, whether or not the Claim of such Creditor is impaired under the Plan, and

10  whether or not such Creditor has accepted or rejected the Plan.

11         The Confirmation Order shall further operate as a temporary "channeling injunction" to

12  bar Creditors from taking any action to pursue their Claims against the Liquidating Trust outside

13  of what is distributed through the Plan.

14         Creditors may or may not be able to pursue their Claims against post petition personal

15  services income of the Debtor, or other assets the Debtor acquired post-petition; e.g., through a

16  post-petition  inheritance.  This depends on whether the Debtor obtains a permanent "discharge"

17  of his Debts pursuant to Bankruptcy Code Section 1141(d)(4) & (5).  The Bankruptcy Code and

18  the Plan set forth requirements for the Debtor to obtain a discharge.  Whether that occurs is

19  largely outside the purview of the Trustee.

20         Nothing in the Plan is intended or shall alter or impact any Order entered in this case

21  approving any settlement agreement, including without limitation that certain "Order Granting

22  Trustee's Motion for Approval of 'Stipulated Agreement for Provision of Adequate Protection

23  and Disbursement of Funds from Blocked account' and Compromise of Controversy", Dkt. No.

24  1799,  all such orders shall remain in full force and effect after confirmation of the plan.

25         **IV.  FEASIBILITY OF THE CHAPTER  11 TRUSTEE'S PLAN**

26         Successful consummation of the Plan is not certain.   Nonetheless, the Trustee believes

that the Plan meets the feasibility test of Bankruptcy Code Section 1129(a)(11). The specific

contingencies to the success of the Plan include the following:

First, the amount of the Allowable Administrative Claims must be kept at a reasonable

level. Allowed Administrative Claims must be paid in full in cash on the Effective Date unless

the claimant in question agrees otherwise. The Trustee believes that he will have more than

sufficient cash on hand required to the pay the undisputed Administrative Expenses. However,

as noted above, Soleseco LLC has asserted an administrative claim in the combined amount of

$8,000,000 +. If this administrative claim is allowed in some seven-figure amount, it is unlikely

that the Trustee will have sufficient cash to pay the claim in question on the Effective Date.

Second, the revenues from the dairies must be sufficient to pay all operating expenses and

pay the restructured debt service due the Allowed Secured Claims pending the sale of the

respective dairy assets. This is a complicated projection dependent in part on fluctuating milk

and other commodity prices. The Trustee has prepare detailed four year projections establishing

positive cash flow, based on the assumption that the pending sale of G.J. te Velde Dairy to

Maricopa Orchards, LLC will close as scheduled in January, 2020, as scheduled. The cash flow

budget and projections are broken down into two parts. First, there is a short term cash flow

budget covering G.J. te Velde Dairy, Pacific Rim Dairy, and the cleanup for Lost Valley Farm

through January, 2020, attached as Exhibit 5.[13] Second, starting January 2020 when Pacific Rim

Dairy will be the sole operations of the Estate, there is a four year cash flow budget for Pacific

Rim Dairy only attached as Exhibits 6, four year statements of annual income and cash flow are

attached as Exhibits 7 & 8, the "assumptions and variables" behind this analysis attached as

Exhibit 9, and the "sensitivity analysis" showing the effect of commodity price fluctuations is

attached as Exhibit 10. A more readable version of these spreadsheets in electronic format may

be obtained by contacting the Trustee's counsel.

---

[13] The cash balances shown on Exhibit 5 are for dairy operations only and do not include cash held from asset sales

Third, there is no assurance that the restructured secured debt proposed by the Plan will be confirmed by the Bankruptcy Court.  Under the U.S. Supreme Court's decision in *Till v. SCS Credit Corp*., 541 U.S. 465, 124 S.Ct. 1951 (2004), it is very possible that the Court could require a higher interest rate or different amortization schedule as a condition of confirmation, which would result in infeasible debt service. However, assuming the Plan as drafted is confirmed, the Trustee believes that it will result in total aggregate monthly debt service of approximately $260,000 pending sale of both dairies.  On sale of the GJT Dairy, monthly debt service will drop to approximately $110,000, pending sale of the PRD Dairy.  If commodity prices remain relatively stable, the Trustee believes that he can make those debt service payments.

Fourth, there must be little or modest capital gains tax due from the three dairies for their to be a meaningful return to unsecured creditors.  Post-petition tax liabilities are entitled to administrative priority and must be satisfied in full before any payment is made to general unsecured creditors.  The Trustee believes that the Debtor incurred a tax loss on the sale of the Lost Valley Farm in the approximate amount of $30 Million.  The Trustee further believes that this loss will offset any gain incurred by the Estate on the sale of the GJT Dairy and the PRD Dairy.  However, creditors should be aware that no tax returns have yet been prepared and this is a complex issue requiring further investigation and analysis.

## V.  ALTERNATIVES TO THE CHAPTER  11 TRUSTEE 'S PLAN

A.     Chapter 7 Liquidation

In a hypothetical Chapter 7 liquidation proceeding, the Debtor's interest in any assets of the Estate would vest in a Chapter 7 trustee, who would shut the dairies  down and either (1) release all of the remaining assets to the respective secured creditors or (2) attempt to  sell those assets to third parties and distribute any proceeds remaining after pay off of the Secured Creditors to the other  creditors of the estate under the priorities established by Bankruptcy Code Section 507.  Chapter 7 liquidation is not a viable alternative to the Plan in this particular case.  Because

the Debtor is a "farmer" under the definition set forth in the Bankruptcy Code, the case cannot be converted to Chapter 7 absent his consent.

The Trustee believes that the Plan is significantly more beneficial to Creditors and other parties in interest than Chapter 7 for four reasons.

First, the Plan enables the Trustee to generate profits to pay creditors through the ongoing operation of the dairies. This cannot be done in a Chapter 7.

Second, it is virtually certain that General Unsecured Creditors would receive nothing in a Chapter 7 liquidation. All of the remaining assets of the Estate are subject to senior, duly perfected liens in favor of Golden State Farm Credit, J.D. Heiskell Holdings, LLC, Rabo AgriFinance, LLC, and Overland Stockyards, Inc. in the combined amount of approximately $85 Million. The Trustee believes that the liquidation value of the Debtor's assets is considerably less than that, making it highly likely that unsecured creditors will receive nothing in a Chapter 7 liquidation.

Third, the continued operation of the Debtor's remaining two dairies through the Plan, even for a short time, provides a source of ongoing business to those trade creditors continuing to provide goods and services to the Estate.

Fourth, under the Plan, the Liquidating Trustee will make interim distributions to creditors as funds are available. In particular, the Trustee expects to make a substantial distribution from the sale of the Pacfic Rim Dairy. Subsequent distributions will be made from any proceeds of recovery of the "Estate Reserved Litigation". In a Chapter 7 case, distributions are rarely made until the final closing of the case.

B.      <u>No Other Plans</u>

The Bankruptcy Code permits different parties to propose competing plan of reorganization under certain circumstances. The Chapter 11 Trustee's Plan is the only Plan which has been proposed at this time.

C.      <u>Dismissal of the Chapter 11 Case</u>

1    Another possible alternative is dismissal of the Chapter 11 Case.  Pursuant to Bankruptcy

2  Code Section 1112, the Bankruptcy Court has the power to dismiss a Chapter 11 Case on the

3  motion of a party in interest, after notice and a hearing, if the Court determines that this relief is

4  in the best interests of creditors.  If the Chapter 11 Case is dismissed, Creditors may pursue state

5  law remedies against the Debtor as if the Case had never been filed.

6    The Chapter 11 Trustee contends that dismissal is neither a realistic nor a beneficial

7  alternative for a number of reasons.

8    First, the Trustee contends that it is virtually impossible for a party in interest to

9  successfully move for dismissal of a Chapter 11 Case when other parties in interest object and/or

10  do not affirmatively asset.  The Trustee believes that a number of parties would object to such a

11  motion in the instant case.

12    Second, dismissal of the Chapter 11 Case impairs the ability of parties in interest to

13  benefit from any recovery by the Trustee in connection with the Estate Reserved Litigation.

14    Finally, traditionally bankruptcy permits the orderly and equitable division of a debtor's

15  assets among all creditors.  Outside of bankruptcy, only creditors willing to fund expensive

16  collection efforts can effectively collect from the Debtor.

17    **VI.  FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN**

18    The tax consequences of the Plan will vary based on the individual circumstances of each

19  holder of a Claim.  **Accordingly, each Creditor should consult its own tax**

20  **advisors concerning any income tax consequences of its respective treatment**

21  **under the Plan.**

22    With that qualification, the following discussion is a summary of certain U.S. federal

23  income tax consequences of the Plan to the holders of Claims.  Due to the lack of directly

24  applicable legal precedent, the possibility of changes in the law, the differences in the nature of

25  the Claims, and the potential for disputes as to legal and factual matters with the IRS, the tax

26  consequences described herein are subject to significant uncertainties. No legal opinions have

1    been requested from counsel with respect to any of the tax aspects of the Plan and no rulings

2    have been or will be requested from the IRS with respect to any of the issues discussed below.

3            This discussion does not purport to address all aspects of U.S. federal income taxation

4    that may be relevant to the holders of Claims in light of their personal circumstances, nor does

5    the discussion deal with tax issues with respect to taxpayers subject to special treatment under

6    the U.S. federal income tax laws (including, for example, banks, governmental authorities or

7    agencies, pass-through entities, insurance companies, financial institutions, tax-exempt

8    organizations, and foreign taxpayers).  This discussion does not address the tax consequences to

9    holders of Claims who did not acquire such Claims at par.  No aspect of foreign, state, local or

10   estate and gift taxation is addressed.

11           Under the Plan, substantially all of the assets of the te Velde Estate will be transferred to

12   the  Liquidating Trust.  The Liquidating Trustee will be responsible for the reporting and

13   payment of any tax arising from the liquidation of the Debtor's assets.  Pursuant to the Plan, the

14   Trustee will make a good faith valuation of the Liquidating Trust's assets.  All parties must

15   consistently use such valuation for all Federal income tax purposes.  The valuation will be made

16   available to the parties, from time to time, as relevant for tax reporting purposes.

17           With the exception of the "Disputed Ownership Fund" described below, the Liquidating

18   Trust is intended to qualify as a liquidating trust for federal income tax purposes and a "grantor"

19   trust (i.e., a pass-through entity).  The IRS, in Revenue Procedure 94-45, 1994.28 I.R.B. 124, has

20   set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a

21   liquidating trust under a chapter 11 plan.  The Liquidating Trust has been structured with the

22   intention of complying with such general criteria, and is consistent with a number of other

23   Liquidating Trusts administered by the Trustee in other cases without adverse tax consequences.

24   Pursuant to the Plan, and in conformity with Revenue Procedure 94-95, all parties (including the

25   Liquidating Trustee and the holders of beneficial interests in the Liquidating Trust) are required

26   to treat for federal income tax purposes, the Liquidating Trust as a grantor trust of which the

holders of Allowed Claims are owners and grantors. Although the Trustee has assumed that the

Liquidating Trust will be treated as a pass-through entity for federal income tax purposes, as

noted above, no ruling has been requested from the IRS concerning the tax status of the

Liquidating Trust as a grantor trust. Accordingly, it is possible that the IRS could take a contrary

position.

In general, each holder of an Allowed Claim will recognize gain or loss in an amount

equal to the difference between (a) the "amount realized" by such holder in satisfaction of its

Claim, and (b) such holder's adjusted tax basis in such Claim. The "amount realized" by a

holder will equal the sum of cash and aggregate fair market value of the property received by

such holder pursuant to the Plan. Where gain or loss is recognized by a holder in respect to its

Allowed claim, the character of such gain or loss (i.e., long-term or short-term capital, or

ordinary income) will be determined by a number of factors including the tax status of the holder,

whether the Claim constituted a capital asset in the hands of the holder and how long it has been

held, whether the Claim was acquired below par, and whether and to what extent the holder

previously claimed a bad debt deduction in respect to the Claim.

Subject to definitive guidance from the IRS or a final determination of a court of

competent jurisdiction to the contrary (including receipt by the Trustee of an IRS private letter

ruling if the Trustee requests one, or the receipt of an adverse determination by the IRS upon

audit if not contested by the Trustee), the Trustee will (a) elect to treat any Liquidating Trust

assets allocable to, or retained on account of, Disputed Claims as a "Disputed Ownership Fund"

governed by Treasury Regulation 1.468B-9, and (b) the extent permitted by applicable law,

report consistently with the foregoing for state income tax purposes. For Federal income tax

purposes, the Disputed Ownership Fund shall be treated as the owner of all assets that it holds.

The Disputed Ownership Fund is treated as a C corporation for purposes of subtitle F of the

Internal Revenue Code relating to procedure and administration, and the administrator of the

fund must obtain an employer identification number for the fund, make all required income tax

and information returns and deposit all tax payments.  Accordingly, the "Disputed Ownership Fund" will be subject to tax annually as a separate entity on any net income earned with respect to the assets in such Fund, and all distributions from such Fund will be treated as received by holders in respect of their Claims as if distributed by the Debtor.  All parties will be required to report for tax purposes consistent with the foregoing.

The federal income tax reporting obligation of a holder of a beneficial interest in the Liquidating Trust is not dependent upon the Liquidating Trust distributing any cash or other proceeds.  Therefore, a holder of a beneficial interest in the Liquidating Trust may incur a federal income tax liability regardless of the fact that the Liquidating Trust has not made, or will not make, any concurrent or subsequent distributions to the holder.  If a holder incurs a Federal tax liability but does not receive distributions commensurate with the taxable income allocated to it in respect of its beneficial interests in the Liquidating Trust it holds, the holder may be allowed to a subsequent or offsetting loss.

The Liquidating Trustee will file with the IRS returns for the Liquidating Trust as a grantor trust pursuant to Treasury Regulations section 1.671-4(a).

In connection with the Plan, the Liquidating Trustee is obligated to comply with all applicable withholding and reporting requirements imposed by taxing authorities, and all distributions under the Plan are subject to those withholding and reporting requirements.  Creditors may be required to provide certain tax information as a condition to receiving distributions pursuant to the Plan.  Each person receiving a distribution pursuant to the Plan will have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations, on account of that distribution.

Events subsequent to the date of this Disclosure Statement, such as the enactment of additional tax legislation, could change the federal income tax consequences of the Plan.

CREDITORS ARE ADVISED TO CONSULT THEIR OWN TAX ADVISORS TO

REVIEW THIS MATERIAL AND TO CONSIDER THE TAX CONSEQUENCES OF THE

PLAN TO THEM, INCLUDING THE EFFECT OF FOREIGN, STATE, AND LOCAL TAXES.

THIS DISCLOSURE STATEMENT IS NOT INTENDED TO BE AND SHOULD NOT BE

CONSTRUED AS LEGAL OR TAX ADVICE TO ANY CREDITOR.

> IRS Circular 230 Notice: To ensure compliance with IRS Circular 230, holders of Claims are hereby notified that: (a) any discussion of federal tax issues contained or referred to in this Disclosure Statement is not intended or written to be used, and cannot be used, by holders of Claims for the purpose of avoiding penalties that may be imposed on them under the Tax Code; (b) such discussion is written in connection with the promotion by the Trustee of the transactions or matters addressed herein; and ( c) holders of Claims should seek advice based on their particular circumstances from an independent tax advisor.

### VII.  VOTING, ACCEPTANCE AND CONFIRMATION

A.　　In General.

The Hon. Fredrick Clement, Judge, United States Bankruptcy Court, has set a date for the

hearing on the Confirmation of the Plan. The hearing is to be held at the United States

Bankruptcy Court, 2500 Tulare St.,  Fifth Floor, Fresno, CA 93721.  The Plan can be

implemented only if accepted by the requisite percentage of creditors and confirmed by the

Bankruptcy Judge.  Creditors entitled to vote  should vote on the Plan by filling out and mailing

the accompanying ballot to  counsel.  There is no assurance that, if accepted, the Plan will be

confirmed by the Bankruptcy Judge.

B.　　Voting.

Only impaired classes under the Plan will be entitled to vote on the Plan.    The definition

of an "impaired" class of Creditors is set forth in  Section 1124 of the Bankruptcy Code.  Classes

1, 2, 3, 4, 5, 6, and 11  are impaired by the Plan and entitled to vote.  No other Classes are

impaired under the Plan.  Pursuant to Section 1126(f) of the Bankruptcy Code, a class that is not

impaired under the Plan, and each holder of a Claim of such class, are conclusively presumed to

have accepted the Plan, and solicitation of acceptances with respect to such class from the

holders of Claims or Interests of such class is not required.  The Bankruptcy Code defines

"acceptance" of a plan by a class of Creditors as acceptance by the holders of two-thirds (2/3) in

dollar amount and more than one-half (½) in number of the claims of that class which actually

cast ballots for acceptance or rejection of the Plan.

In addition to the requirement that a Creditor be in an "impaired class", in order for a

creditor's vote to be counted, either for or against the Plan, the creditor must have either (1)  filed

a Proof of Claim on or before the "Claims Bar Date", which was previously set by the Court at

September 4, 2018, and not be subject to an Objection to Claim filed by the Trustee; or (2)  have

been listed by the Debtor in the Schedule of Liabilities as having a claim which was

noncontingent and undisputed.

**IF YOU HAVE ALREADY FILED A CLAIM YOU NEED NOT REFILE FOR THE PURPOSE OF**

**VOTING ON THE PLAN.**

If a Creditor wishes to vote for or against the Plan, the Creditor should complete an

acceptance or rejection of the Plan on the form ballot enclosed herewith which must be returned

pursuant to the instructions set forth thereon.

C.    Confirmation

If no impaired Creditor classes accept the Plan, it cannot be confirmed.  If at least one

impaired class of Creditors  accepts the Plan, the Court will hold a Confirmation Hearing.  At the

Confirmation hearing, the Bankruptcy Judge has the duty to determine whether the Plan meets

the requirements of Section 1129 of the Bankruptcy Code.  The principal requirements of Section

1129 include the following: (1) that the proponents of the Plan have complied with the applicable

provisions of the Bankruptcy Code on all matters connected with the case; (2) that the Plan has

been proposed in good faith, and not by any means forbidden by law; (3) that the requisite

amount of creditors have accepted the Plan or that the creditors are receiving an amount not less

than they would receive if liquidation under Chapter 7 took place; (4) that at least one class of

Creditors has accepted the Plan; and (5) that confirmation of the Plan is not likely to be followed

by liquidation, or the need for further financial reorganization of the debtor; and (6) that the Debtor and the Plan in all other respects comply with applicable law. Only if such determinations are made will the Judge confirm the Plan.

If there are impaired Creditor classes which have rejected the Plan, the Bankruptcy Judge may order Confirmation over its rejection, but only if the Judge first determines that the rights of non-consenting classes of creditors are protected under Bankruptcy Code Section 1129(b) and other applicable law. The Chapter 11 Trustee reserves the right to seek confirmation under Bankruptcy Code Section 1129(b) of this Plan.

        D.    Modification of the Plan.

The Chapter 11 Trustee may propose amendments to or modifications of the Plan under Section 1127(a) of the Bankruptcy Code and Bankruptcy Rule 3019 at any time prior to the conclusion of the hearing on Confirmation of the Plan. After the Confirmation Date, the Liquidating Trustee may modify the Plan in accordance with Section 1127(b) of the Bankruptcy Code and Bankruptcy Rule 3019. All parties in interest shall retain the right to object to any modification of the Plan.

## VIII. **CONCLUSION**

The Chapter 11 Trustee believes that his Plan of Reorganization realistically affords to Creditors their best opportunity for receiving a prompt, meaningful dividend. The Chapter 11 Trustee respectfully request Creditors vote to accept the Chapter 11 Trustee's Plan.

Dated: August 5, 2019

                /s/ Randy Sugarman
               Randy Sugarman, Chapter 11 Trustee

Dated: August 5, 2019          MacCONAGHY & BARNIER, PLC

                /s/ John H. MacConaghy
               By John H. MacConaghy
               Attorneys for the Chapter 11 Trustee